LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
SCOTT J. STREET (State Bar No. 258962)
sstreet@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:  (310) 552-8400

BRIAN E. WATKINS (State Bar No. 190599)
bwatkins@brianwatkinslaw.com
BRIAN E. WATKINS & ASSOCIATES
925 B Street, Suite 402
San Diego, California 92101
Telephone:   (619) 255-5930
Facsimile:   (619) 255-5639

Attorneys for Plaintiffs S.R. NEHAD, K.R. NEHAD, and ESTATE OF FRIDOON RAWSHAN NEHAD

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.R. NEHAD, an individual, K.R. NEHAD, an individual, ESTATE OF FRIDOON RAWSHAN NEHAD, <br><br> Plaintiffs, <br><br> v. <br><br> NEAL N. BROWDER, an individual, and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO. '15CV1386 WQHNLS <br><br> COMPLAINT FOR: <br><br> (1) DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (FOURTH AMENDMENT); AND <br><br> (2) DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (FOURTEENTH AMENDMENT) <br><br> **DEMAND FOR JURY TRIAL** |

259797.1

Case No.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Plaintiffs S.R. Nehad and K.R. Nehad (the "Nehads") and the Estate of Fridoon Rawshan Nehad (the "Estate") (collectively, "Plaintiffs") allege as follows:

## INTRODUCTION

1. On April 30, 2015, Fridoon Rawshan Nehad ("Fridoon") was shot to death by Defendant Neal N. Browder. Browder was acting under color of authority, in his capacity as a San Diego police officer. Fridoon was unarmed.

2. The shooting was captured on a surveillance video owned by a private business named KECO, Inc. (the "KECO Video"). KECO has the video of the shooting and provided a copy to the San Diego Police Department ("SDPD"). KECO's attorney has agreed to provide a copy of the video to Plaintiffs, but only pursuant to a legally issued subpoena, necessitating this lawsuit.

3. Individuals have seen the KECO Video. One of them called the video "shocking" and stated that Browder appeared to shoot Fridoon "on a whim," at a moment when Fridoon's walking cadence noticeably changed from normal to a near-stop.

4. Browder was wearing a body camera but it was not activated when the shooting occurred. The KECO Video is critical direct evidence of the shooting and will establish whether the shooting was justified.

5. Based on the accounts of the SDPD and individuals who have seen the KECO Video, Plaintiffs believe that Fridoon's shooting was unjustified. They bring this action for violation of their civil rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. They have also filed an administrative claim with the City of San Diego and intend to amend this Complaint and add common law claims, if necessary.

6. At this juncture, Plaintiffs' only means of understanding Fridoon's untimely death is to see the KECO Video. They have tried to obtain it from the SDPD but no avail: the SDPD refused to provide the video and told Plaintiffs to file a lawsuit if they wanted to see it. Plaintiffs also tried to obtain a copy of the video

from KECO, but KECO said it would only produce the video if it receives a subpoena. The City of San Diego would not give Plaintiffs a copy of the video either.

## PARTIES, JURISDICTION AND VENUE

7. The Estate is Fridoon's probate estate. Under Section 377.20 of the California Code of Civil Procedure, the Estate has standing to bring claims for Fridoon's pre-death pain and suffering. For jurisdictional purposes, and since Fridoon's death occurred in California, the Estate resides in California.

8. Plaintiff S.R. Nehad is a United States citizen. She is Fridoon's mother and resides in San Diego, California. Plaintiff K.R. Nehad is a United States citizen. He is Fridoon's father and resides in San Diego, California.

9. Defendant Neal N. Browder is a United States citizen. He resides in Temecula, California.

10. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10 and therefore sue those unknown Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege said Defendants' true names and capacities when ascertained. Plaintiffs are informed and believe that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein, and that Plaintiffs' injuries were proximately caused by the acts and/or omissions of said fictitiously named Defendants.

## JURISDICTION AND VENUE

11. This is a civil suit brought under the Civil Rights Act, 42 U.S.C. § 1983, for violations of Plaintiffs' rights under the United States Constitution. This Court has subject matter jurisdiction over the parties and this action pursuant to 28 U.S.C. § 1343(a)(3) and 28 U.S.C. § 1331.

12. This suit seeks compensatory and punitive damages against all Defendants as permitted by law.

13. Venue is proper in this Court because the events or omissions that gave rise to each of these causes of action occurred in San Diego, California, within the Southern District of California.

## FACTS

### A. Fridoon and His Family

14. Fridoon grew up in Afghanistan. He was an intelligent, kind, thoughtful and creative person. He had a loving and happy childhood. But it was interrupted by the Russian invasion of Afghanistan and the internal civil war after the Russians left.

15. The civil war pitted the Afghan government against groups called the Mujahideen (some of these groups would later form the Taliban). Fridoon was drafted into the Afghan army when he was a teenager. While serving, he was captured by one of the Mujahideen groups. He spent nearly two months in captivity and was only released after his mother met face-to-face with the kidnappers and pleaded for the release of her son.

16. Fridoon did not talk much about the war. He likely was tortured. The Mujahideen had a well-documented practice of torturing their prisoners of war.

17. After his release, Fridoon still was in grave danger of further persecution by the Mujahideen (which opposed the government). To save his life, his family got him out of Afghanistan and into refuge in Germany. He was a teenager at the time.

18. Fridoon spent the next 14 years in Germany, isolated from his family. He saw his parents just a few times. He did not see his siblings (six sisters) at all.

19. In 1991, the Nehads immigrated to the United States, settling in San Diego. They became American citizens. Their daughters attended school and have jobs and careers in the U.S. in medicine, law and business. Fridoon finally joined them in 2003.

20. Fridoon suffered from Post-Traumatic Stress Disorder ("PTSD"). He

also was diagnosed with schizophrenia and bipolar disorder.

21. Fridoon battled against his illnesses. He was intelligent, learning new languages (German and French) and taking classes on computer programming, linguistics and literature. He became a permanent resident of the United States and obtained a work permit. He tried to improve his life. But he sometimes had manic episodes. He was arrested and, in 2008, went to jail for burglary.

22. Fridoon was loved. His family spent years and countless hours trying to help him cope with his PTSD and illness. At times, it was difficult.

23. Fridoon was receiving treatment for his PTSD and mental illness. But he still had manic episodes. During one episode, he became upset with his mother and sister, who called the police. The police recommended that the Nehads get a restraining order.

24. The police told the Nehads that getting a restraining order would help Fridoon get into a shelter in Oceanside, which he had visited. The Nehads trusted the police and followed their advice.

**B.  Fridoon's Shooting**

25. On April 29-30, 2015, Fridoon was walking in downtown San Diego.

26. Browder responded to a 911 call from an adult bookstore employee. He arrived at the store around midnight.

27. According to a KECO employee who saw the KECO Video, Fridoon was walking in the alley behind the bookstore when Browder arrived in his police car. He was about 15 to 20 feet away from the police car when Browder stepped out of his car and, within seconds, fired his side arm, hitting Fridoon with at least one shot. Fridoon died later at UCSD Medical Center.

28. The KECO employee who saw the video, Wesley Doyle, provided a declaration about what he remembers about the KECO Video. Doyle said the shooting was "unprovoked" and "shocking." Browder did not take any time to communicate with Fridoon and did not use any other (non-deadly) measures against

Fridoon. He did not even get into a police shooting stance. He appeared to shoot Fridoon "on a whim," at a moment when Fridoon's walking cadence noticeably changed from normal to a near-stop.

### C. The SDPD Cover-Up and the KECO Video

29. Fridoon was not armed. Nonetheless, the SDPD tried to "spin" the story against Fridoon, falsely suggesting to his family and the media that he had a knife. The SDPD also falsely claimed that Fridoon was threatening Browder when, in fact, Fridoon was shot at a distance of at least 15 feet and just after Browder arrived at the scene.

30. Browder was wearing a body camera that night. But it was not activated at the time of the shooting. After the killing, the SDPD admitted that it had not properly trained its officers on use of their cameras and changed its policy and practice to require they be turned on during all law enforcement contacts with civilians (which would have included the incident preceding Fridoon's shooting).

31. The KECO Video is direct evidence of Fridoon's shooting. The existence of the KECO Video became known after an employee of KECO saw the video and contacted the media to rebut the SDPD's story.

32. There are two copies of the KECO Video. KECO has one. The SDPD has the other.

33. Plaintiffs requested a copy of the KECO Video from the SDPD but their request was rejected. The SDPD told Plaintiffs that they should file a lawsuit if they wanted to see the video.

34. Plaintiffs also asked KECO to turn over its copy of the video. KECO also declined. However, KECO's attorney agreed to give Plaintiffs a copy of the video pursuant to a subpoena, during a lawsuit.

35. Plaintiffs made a similar request to the City of San Diego. But the City also refused to give Plaintiffs the video. Plaintiffs' only option is to file this action and seek leave of court to serve a subpoena on KECO.

36. Plaintiffs are filing this action concurrently with a motion for leave to serve the KECO subpoena and obtain the video. As more fully set forth in that motion, there will be no harm or prejudice to the defendants. KECO is a private business and is willing to produce the video pursuant to a subpoena.

37. There is great harm, prejudice and unfairness to Plaintiffs in not getting the video. That is the only way they can see what truly happened and proceed with their claim. There is no good reason to delay the process: the video is clearly discoverable and could affect the just and speedy resolution of this case.

## FIRST CAUSE OF ACTION
### (Deprivation of Civil Rights Under 42 U.S.C. § 1983 (Fourth Amendment))
### (By the Estate Against Browder)

38. Plaintiffs repeat and re-allege the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

39. This cause of action is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

40. Under section 377.20 of the California Code of Civil Procedure, the Estate is Fridoon's successor-in-interest and has standing to assert a claim for Fridoon's pre-death damages.

41. Defendant Browder shot and killed Fridoon. Shooting a weapon is the use of deadly force. Plaintiffs are informed and believe, and on that basis allege, that deadly force was not warranted: Fridoon did not have a weapon and was not threatening Browder, or anyone else, with deadly force.

42. In the process, Browder violated Fridoon's right to be free from excessive force as secured by the Fourth and Fourteenth Amendments.

43. Browder acted under color of law and within the course and scope of his employment with the City of San Diego and the SDPD in deploying excessive force against Fridoon.

44. Browder's actions directly and proximately caused injury to Fridoon, as

he was mortally wounded and endured horrific pain and suffering in the time before he died.

45. As a result of Browder's actions, the Estate is entitled to damages in an amount to be proven at trial.

46. Browder acted in knowing violation of Fridoon's legal and constitutional rights and without good faith, so punitive damages are warranted.

## SECOND CAUSE OF ACTION

**(Deprivation of Civil Rights Under 42 U.S.C. § 1983 (Fourteenth Amendment))**

**(By the Nehads Against Browder)**

47. Plaintiffs repeat and re-allege the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

48. This cause of action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution.

49. Defendant Browder shot and killed Fridoon. Shooting a weapon is the use of deadly force. Plaintiffs are informed and believe, and on that basis allege, that deadly force was not warranted: Fridoon did not have a weapon and was not threatening Browder, or anyone else, with deadly force.

50. In the process, Browder violated the Nehads' liberty interest in the companionship of their eldest child and only son, a right secured by the Fourteenth Amendment.

51. Browder acted under color of law and within the course and scope of his employment with the City of San Diego and the SDPD in deploying excessive force against Fridoon.

52. Browder's actions directly and proximately caused injury to the Nehads, as the shooting killed Fridoon and deprived the Nehads of the companionship of their eldest child and only son.

53. As a result of Browder's actions, the Nehads are entitled to damages in an amount to be proven at trial.

54. Browder acted in knowing violation of the Nehads' legal and constitutional rights and without good faith, so punitive damages are warranted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. For damages in an amount to be proven at trial, including general damages, special damages and punitive damages;

2. For attorneys' fees, costs and interest; and for such other and further relief as the Court deems just and proper.

DATED: June 24, 2015

MILLER BARONDESS, LLP

By: /s/

LOUIS R. MILLER
Attorneys for Plaintiffs S.R. NEHAD, K.R. NEHAD, and ESTATE OF FRIDOON RAWSHAN NEHAD

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38.1, Plaintiffs hereby demand a trial by jury.

DATED: June 24, 2015         MILLER BARONDESS, LLP

By: /s/ *signature*
LOUIS R. MILLER
Attorneys for Plaintiffs S.R. NEHAD, K.R. NEHAD, and ESTATE OF FRIDOON RAWSHAN NEHAD