LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
DANIEL S. MILLER (State Bar No. 218214)
dmiller@millerbarondess.com
SCOTT J. STREET (State Bar No. 258962)
sstreet@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:   (310) 552-8400

BRIAN E. WATKINS (State Bar No. 190599)
bwatkins@brianwatkinslaw.com
BRIAN E. WATKINS & ASSOCIATES
925 B Street, Suite 402
San Diego, California 92101
Telephone:  (619) 255-5930
Facsimile:  (619) 255-5639

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.R. NEHAD, an individual, K.R. NEHAD, an individual, ESTATE OF FRIDOON RAWSHAN NEHAD, an entity,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>SHELLEY ZIMMERMAN, in her personal and official capacity as Chief of Police, NEAL N. BROWDER, an individual, CITY OF SAN DIEGO, a municipality, and DOES 1 through 10, inclusive,<br><br>　　　　Defendants. | [Assigned to the Honorable William Q. Hayes]<br><br>**CASE NO. 15-cv-1386-WQH-NLS**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CHANGE VENUE**<br><br>[File Concurrently with Declaration of Scott J. Street and exhibits thereto; [Proposed] Order lodged concurrently]<br><br>Date:　　December 28, 2015 |

273843.8

Case No. 15-cv-1386-WQH-NLS

PLAINTIFFS' MOTION TO CHANGE VENUE

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | FACTS OF THE CASE | | 4 |
| | A. | The Shooting | 4 |
| | B. | The SDPD's Actions After the Shooting | 4 |
| | C. | Initial Media Coverage | 5 |
| | D. | This Lawsuit | 5 |
| | E. | The DA's Media Campaign in November 2015 | 6 |
| | F. | The DA Is Manipulating the Court System | 8 |
| | G. | The City Used the DA's Media Campaign to Taint the Jury Pool | 9 |
| III. | ARGUMENT | | 10 |
| | A. | Inflammatory Pre-Trial Publicity Violates the Constitution | 10 |
| | B. | The DA Has Tainted the Jury Pool | 11 |
| | C. | The DA Violated Ethical Rules | 13 |
| | D. | Voir Dire Will Not Cure the Prejudice Caused by the DA | 14 |
| | E. | Another District Will Not Be Inconvenient | 15 |
| IV. | CONCLUSION | | 15 |

# TABLE OF AUTHORITIES

**Page**

## CASES

*Blanco v. Banco Industrial de Venezuela, S.A.*,
   997 F.2d 974 (2d Cir. 1993).................................................................................15

*Casey v. Moore*,
   386 F.3d 896 (9th Cir. 2004).................................................................................10

*Del Grosso v. City of Philadelphia*,
   2010 WL 3384822, (E.D. Pa. Aug. 20, 2010)......................................................12

*Gotbaum v. City of Phoenix*,
   617 F. Supp. 2d 878 (D. Ariz. 2008)....................................................................10

*Hyppolite v. Collins*,
   No. 11-CV-588 (WIG), 2015 WL 269219, (D. Conn. Jan. 21, 2015)..............11

*Koch v. Koch Indus., Inc.*,
   2 F. Supp. 2d 1409 (D. Kan. 1998).......................................................................10

*Nat'l Fuel Gas Co. v. U.S. Energy Savings Corp.*,
   No. 07-CV-440A(F), 2008 WL 2405725, (W.D.N.Y. June 11, 2008)...........11

*Nevers v. Killinger*,
   990 F. Supp. 844 (E.D. Mich. 1997)....................................................................11

*Sheppard v. Maxwell*,
   384 U.S. 333 (1966)......................................................................................13, 14

*Watts v. Hollock*,
   2011 WL 6026998, (M.D. Pa. Dec. 5, 2011).......................................................11

## STATUTES

28 U.S.C. § 1404......................................................................................................15

California Business and Professions Code §6068 ..............................................8, 14

California Constitution, Art. 1, §29 .........................................................................8

California Rules of Professional Conduct 5-120 ................................................8, 14

## OTHER AUTHORITIES

ABA Model Rule 3.8 ..............................................................................................13

ABA Model Rule Comments, § 1 ..........................................................................13

**TO ALL PARTIES AND THEIR ATTORNEY OF RECORD:**

**PLEASE TAKE NOTICE** that, on December 28, 2015, or as soon thereafter as the matter may be heard before the Honorable William Q. Hayes, Plaintiffs S.R. Nehad and K.R. Nehad (the "Nehads") and the Estate of Fridoon Rawshan Nehad (collectively, "Plaintiffs") will, and hereby do, move for an order transferring this case to the Central District of California or another District in the State of California.

This relief is sought under the Fifth and Fourteenth Amendments to the U.S. Constitution, on the grounds that the San Diego County District Attorney has made dishonest, inflammatory and gratuitous statements about this case in the press, including improper and inadmissible attacks on the victim (Fridoon) and praise for the shooter (Officer Neal Browder). The DA's media campaign has irreparably tainted the jury pool and denied Plaintiffs their constitutional right to a fair trial.

The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Scott J. Street and exhibits thereto, all pleadings and papers on file in this action, and any other material the Court deems proper. Pursuant to the Court's Local Rules, Plaintiffs' counsel met-and-conferred with counsel for the Defendants prior to filing the Motion and asked that Defendants stipulate to changing venue; they declined.

Plaintiffs request oral argument.

DATED: November 30, 2015        MILLER BARONDESS, LLP

By: /s/ FRZ

LOUIS R. MILLER
Attorneys for Plaintiffs S.R. NEHAD,
K.R. NEHAD, and ESTATE OF
FRIDOON RAWSHAN NEHAD

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This case arises from a fatal police shooting. Plaintiffs filed suit in San Diego because the shooting happened there. But they can no longer get a fair trial in San Diego because a high-level, powerful, trusted public official, San Diego County District Attorney Bonnie Dumanis, has gone out in the media and prejudiced the jury pool. The motion is based on actions by the popularly-elected chief prosecutor for San Diego County.

Recently, on November 9, 2015, DA Dumanis called a press conference and made dishonest, inflammatory and gratuitous statements about this case. She attacked the victim, Fridoon Nehad, as a violent criminal with a long rap sheet; and she praised the shooter, Officer Neal Browder, as a model police officer who did nothing wrong.

Among other things, the DA:

- Identified 18 prior violent incidents involving Fridoon (dating to 2004);
- Called Fridoon a drug addict who was a threat to the community;
- Said Fridoon "was not taking any appropriate medications to treat his bipolar disorder or schizophrenia";
- Said Fridoon "was not someone who could be reasoned with";
- Called Fridoon's family "his most frequent victims"; and
- Speculated that Fridoon knew Browder was a police officer and attacked him anyway.

DA Dumanis also lied about the video of the shooting, saying it shows Fridoon in "mid-stride" when the shooting occurred and that Fridoon was about to attack Browder with a weapon. In fact, per the video, Fridoon was *stopped*, 25 feet away from Browder and was holding a *blue pen* when Browder inexplicably gunned

him down. Dumanis had the video and made these false statements anyway.[1]

These were not isolated statements. DA Dumanis called a press conference to broadcast her comments in the media as widely as possible. Every television station in San Diego covered the story. And the DA is continuing to spread her "story" through social media – Twitter, press releases and Facebook.

That is different than how the DA has handled other police shootings. We obtained letters from seven other shootings in which DA Dumanis declined to file charges against a police officer. Each letter contained a description of the facts and a *single sentence* saying that: "Irrespective of any laws applicable to situations where peace officers use deadly force in accomplishing their duties, the law of self-defense is available to any person."

The DA changed that section in Fridoon's letter. She expanded the single sentence about self-defense to *five pages*. She used this expanded "self-defense" section to list Fridoon's prior "bad acts" – evidence that is not admissible in this case but is now all over the public airwaves. Copies of these letters are attached to the accompanying declaration.

The DA held the press conference ostensibly to announce that her office would not file charges against the officer. But she went much further than ever before, far beyond her own prior practice. It is evident that the DA was working to prejudice Plaintiffs' case.

Making matters worse, the DA previously filed a declaration opposing release of the shooting video. Her plan, as is now obvious, was to initially block release of the video, then prejudice the jury pool by maligning the victim, praising Officer Browder and calling the video's reliability into question. The DA wanted to get her "spin" out to the public before the video was released.

---

[1] For the Court's information, Plaintiffs are lodging a copy of the video under seal per the Protective Order.

DA Dumanis also speaks out of both sides of her mouth. She wrote an Op-Ed piece on August 21, 2015 in the *San Diego Union-Tribune* advocating that the video of the shooting not be released to the public so as not to prejudice a potential jury pool against Officer Browder. She further stated in the Op-Ed that if she released the video and the officer was charged with a crime, "we could be accused of prosecutorial misconduct because of improper pretrial publicity."

While trumpeting her ethical obligations in opposing release of the video, she then ignored her ethical duties by creating massive pretrial publicity in favor of Officer Browder and against the victim. Perhaps the height of hypocrisy, Dumanis further stated that "We don't try our cases in the media . . . ."

The DA's press conference has tainted the jury pool. For example, the *Union-Tribune* reported on the DA's media blitz and called Fridoon a "menacing mentally ill man" and said that Officer Browder's actions "appear[ ] broadly supported by the evidence [the DA] cites."

San Diego jurors cannot be expected to ignore those statements, or the substantial inadmissible evidence the DA publicized. The DA is the people's elected public prosecutor. As such, the DA is well known and held in high esteem. She is held to strict ethical rules. Her media blitz violated ethical rules. It permeated the community and poisoned the jury pool.

Voir dire will not cure the problem. Even before the DA's outburst, there was significant media coverage of the shooting. We cannot just ask potential jurors if they have seen the media coverage. We will have to dig deeper and ask them, specifically, if they saw the DA's press conference, letter or tweets, or the news stories that reported on them; and this inquiry likely will compound the problem. This presents an intractable and insolvable dilemma.

Transferring this case is the only way to ensure that Plaintiffs will get a fair trial. A jury outside San Diego is less likely to have seen the press coverage of the shooting and less likely to be prejudiced by the DA's false and inflammatory

1  statements. We therefore will not have to voir dire prospective jurors outside San
2  Diego about whether they saw the DA's press conference.
3  **II.  FACTS OF THE CASE**
4      **A.  The Shooting**
5      Fridoon was the Nehads' eldest child and only son. He suffered from mental
6  illness and Post-Traumatic Stress Disorder ("PTSD") resulting from his forced
7  service and capture in the Afghani civil war. He was trying to get his life together.
8      Around midnight on April 30, 2015, Fridoon was walking in downtown San
9  Diego. Officer Browder responded to a 911 call. When he arrived, he drove his car
10 up an alley between a bookstore and another business ("KECO").
11     Fridoon was walking up the alley. He was at least 100 feet away from the
12 police car when Browder first saw him. Fridoon was walking at a casual pace,
13 ambling along.
14     When Fridoon was about 30 feet away, Browder opened his car door and got
15 out. He did not turn the flashing red lights on. He did not use his siren. He did not
16 activate his body video cam, contrary to SDPD policy. His high-beams were
17 shining on Fridoon, who likely did not even know he was approaching a police
18 officer.
19     About 25 feet away, Fridoon slowed and came to a stop. He did not make
20 any aggressive movements or threatening gestures. He was not armed. He was
21 holding a blue pen. This is all evident from the video.
22     Browder thereupon drew his side-arm and fired, hitting Fridoon in the chest.
23 Browder did not get into a shooting stance. He did not put both hands on the
24 weapon. He just raised the gun and fired with one hand. Fridoon was pronounced
25 dead at UCSD Medical Center shortly thereafter.
26     **B.  The SDPD's Actions After the Shooting**
27     The SDPD knew that Fridoon was not armed. Nonetheless, the day after the
28 shooting, the SDPD tried to "spin" the story against Fridoon, falsely suggesting to

1 his family and the media that he had a knife.

2 　　　The SDPD also falsely claimed that Fridoon was threatening Browder. The
3 SDPD knew its claim was false because the police had possession of the video.

4 　　　The police measured the distance between Browder and Fridoon. It was 25
5 feet. Yet, in its post-shooting comments, the SDPD said the distance was 10 to 15
6 feet and that Fridoon "charged" at Browder – both falsehoods.

7 　　　After the shooting, the SDPD did not sequester Browder or test him for drugs
8 or alcohol. It did not give him a *Lybarger* warning. In fact, a few hours after the
9 shooting, when Browder was about to be interviewed by a detective, a union
10 attorney intervened and stopped the questions. The only question asked was
11 whether Browder had seen any weapons on Fridoon; Browder said "No."

12 　　　Browder was wearing a body camera on April 30. But he did not activate it.
13 He violated the SDPD policy that officers "shall" activate their body cams before an
14 encounter and shall record the entire encounter. The SDPD did not discipline
15 Browder. He is back on the street.

16 　　**C.**　**Initial Media Coverage**

17 　　　Right after the shooting, in May 2015, there was significant media coverage.
18 The initial coverage focused on the facts – the circumstances of the shooting, the
19 existence of the video and Browder's failure to activate his body camera.
20 (Declaration of Scott J. Street, dated Nov. 30, 2015 ("Street Decl."), Exhs. O-BB.)

21 　　　At the end of May, Plaintiffs filed an administrative claim for damages with
22 the City. It was denied. The press continued to cover the story but, like the initial
23 coverage, focused on what occurred. (*Id.*, Exhs. CC-II.)

24 　　**D.**　**This Lawsuit**

25 　　　Plaintiffs filed this case in June 2015. The police would not give them the
26 video until they filed a lawsuit. After seeing the video, Plaintiffs filed an amended
27 complaint.

28 　　　The Defendants filed their first answer. Their story was simple: Fridoon

"brandished a metallic pen that appeared to be a knife." Then Fridoon "closed the substantial distance between himself and Officer Browder to between 10 and 15 feet," and Browder shot him. (Dkt. 15, ¶ 30.)

After Defendants filed that answer, they gave Plaintiffs a copy of the SDPD's investigation book. The "investigation" appeared to be a rubber-stamp. Therefore, Plaintiffs filed a Second Amended Complaint ("SAC") adding claims against the City and Police Chief Shelley Zimmerman.

Defendants thereupon *changed* their story. They filed a new, second answer. This time they alleged that Browder "got out of his car when [Fridoon] had closed the gap between them to between 20 to 30 feet; that Officer Browder loudly and clearly ordered [Fridoon] to stop and to 'drop it' or 'drop the knife'; that [Fridoon] continued moving toward Officer Browder, wielding what [he] represented to be a knife; and that when [Fridoon] failed to obey the officer's unmistakable and unequivocal commands, Officer Browder drew his gun and shot [Fridoon] at a distance of approximately 15 to 17 feet." (Dkt. 36, ¶ 5.)

### E. The DA's Media Campaign in November 2015

Ten days after Defendants filed their new answer, on November 9, 2015, DA Dumanis held her press conference. Every television station in San Diego covered the event, plus the *Union-Tribune* and other San Diego media. It was the lead story on the evening news. The DA also issued a 15-page letter about the shooting, plus a press release and tweets. (Street Decl., Exhs. C-F.)

The DA's press campaign was aggressive; she made comments about Fridoon, as follows:

- Identified 18 prior violent incidents involving Fridoon, going back to 2004, and described details of the incidents (including statements allegedly made by Fridoon and his family) (Street Decl., Exh. C ["DA Letter"], at 10-13);

- Called Fridoon a drug addict who was a threat to the community (*id.* at

1        13);

2    • Said Fridoon "was not taking any appropriate medications to treat his
3      bipolar disorder or schizophrenia" (*id.* at 14.)
4    • Said Fridoon "was not someone who could be reasoned with" (*id.*);
5    • Called Fridoon's family "his most frequent victims" (*id.* at 10); and
6    • Speculated that Fridoon knew Browder was a police officer (*id.* at 6).

Meanwhile, the DA lauded Browder as an "exemplary" officer who "has dedicated himself to duty and has performed at the highest levels." (*Id.* at 14.) The DA even quoted Browder's performance reviews, saying he has "unparalleled officer safety skills" and that he is "firm and fair with suspects in criminal cases and with the people he has arrested." (*Id.*) Thus, the DA demonized the victim and exhalted his assailant.

The DA also lied about the video. She said the video "shows Mr. Nehad may have slowed down slightly in his last step, but he did not stop advancing toward Officer Browder" and that the video "shows when Nehad was shot he was still in mid-stride." (*Id.* at 8; *see also id.* at 1 ["At no point did Nehad stop walking toward Browder."].) This is false. The video shows that Fridoon had come to a *stop* before Browder shot him. The DA thus falsified evidence in her zeal to exonerate the officer and convict the victim.

In more aggressive advocacy, the DA called the reliability of the video into question, saying that it "captured this incident from one angle, high up on a pole, without audio." She impugned the video, saying it "can be misleading because of many factors." The DA tried to minimize the video, telling the public not to believe what they see.

Every piece of evidence the DA cited supported Browder. The DA did not mention contrary evidence, such as witness statements that Fridoon was not threatening anybody, that Browder himself did not remember saying anything to Fridoon and that several witnesses believed Browder used excessive force.

These attacks are unlike how DA Dumanis has handled other police shootings. For example, her other declination letters have a description of the facts and a *single sentence* saying that: "Irrespective of any laws applicable to situations where peace officers use deadly force in accomplishing their duties, the law of self-defense is available to any person." (Street Decl., Exh. JJ, at 4.)

In Fridoon's letter, the DA expanded that sentence to a *five-page* diatribe against Fridoon and in support of the officer. (DA Letter, at 9-14.) She listed Fridoon's prior "bad acts." And the DA said that a jury would be able to consider that evidence when reviewing Browder's actions. Indeed, she put those statements in bold text. (*Id.* at 9.)

### F. The DA Is Manipulating the Court System

The DA, in effect, sought to convict Fridoon, and exonerate Browder, in the court of public opinion. The DA's actions are especially disingenuous, as she previously advocated that the video not be released. So, she seeks to suppress the video while at the same time impugning it, to undermine its effect when it comes into evidence at trial.

On September 4, 2015, the City of San Diego filed an opposition to prevent release to the media of the video of Fridoon's shooting. (Dkt. 26). San Diego Chief Deputy DA Paul Azevedo submitted a declaration in support of the City's opposition to release of the video. (Dkt. 26-1). Mr. Azevedo stated:

> [P]rosecutors have a legal and ethical duty to ensure due process. Prosecutors cannot properly make any out of court statements that a reasonable person would expect to be disseminated by means of public communication which the prosecutor knows or reasonably should know will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the case. California Business and Professions Code Section 6068. California Rules of Professional Conduct 5-120. California Constitution, Art. 1, Section 29. Should there be a determination that Officer Browder's conduct was not lawful, and he was to be

> prosecuted, release of these materials could substantially prejudice his right to a fair trial. Further, in the event there is a determination of criminal liability, there is a risk of prejudice to the jury pool by the release of the case materials now.
>
> The release of the video and statement by themselves could be prejudicial because it would be viewed alone and without the context of the entire investigation. Only this limited information concerning the relevant events surrounding the OIS would be made public. The media and the public would naturally be inclined to make certain conclusions from the materials. This could further undermine the officer's right to a fair trial by tainting a potential jury pool.

(Street Decl., Exh. LL, at ¶¶ 6-7.) Well aware of the publicity surrounding this case, the DA sought to block release of the video so as not to "undermine the officer's right to a fair trial by tainting a potential jury pool." The DA, in effect, struck first by gratuitously attacking the victim while exalting and praising the officer. The DA publicly released multiple "facts" having nothing to do with the civil trial while seeking to suppress release of the video.

DA Dumanis speaks out of both sides of her mouth. She wrote an Op-Ed piece on August 21, 2015 in the *San Diego Union-Tribune* advocating that the video of the shooting not be released to the public so as not to prejudice a potential jury pool against Officer Browder. (*Id.*, Exh. KK.) She further stated that if she released the video and the officer was charged with a crime, "we could be accused of prosecutorial misconduct because of improper pretrial publicity." (*Id.*) Dumanis stated that "We don't try our cases in the media . . . ." (*Id.*)

This is the height of dishonesty and hypocrisy. The DA's own statements acknowledge that her media campaign was unethical and improper.

G.  **The City Used the DA's Media Campaign to Taint the Jury Pool**

The City hired two trial consultants who submitted declarations in opposition to the media's motion to release the video. (Street Decl., Exh. MM.) The City

understood the importance of getting its story out before release of the video. Per trial consultant Will Rountree and Alexis Forbes:

> Primacy effects occur when a person draws conclusions on the basis of information that is obtained early, and processed over a period of time. The Primacy Effects theory posits that information an individual acquires early serves as a prism through which the individual processes and understands information that is acquired later.

(*Id.*, ¶ 58.)

With the assistance of the DA, the City was able to take advantage of the "primacy effects" by getting its story out to the public before release of the video. Per the City's own experts, this permanently taints the jury pool against Plaintiffs.

## III. ARGUMENT

This is a high-profile case. The initial media coverage focused on the circumstances of the shooting. The DA changed the coverage. She attacked Fridoon. She lied about the video. She exhalted the shooter.

Voir dire will not cure the problem. It will not be enough just to ask potential jurors if they saw any media coverage of the shooting. We will have to ask them specifically about the DA's press conference, letter and tweets.

### A. Inflammatory Pre-Trial Publicity Violates the Constitution

"[T]here is a constitutional right to a fair trial in the non-criminal context." *Koch v. Koch Indus., Inc.*, 2 F. Supp. 2d 1409, 1412 (D. Kan. 1998) (quotations omitted). Pervasive pre-trial publicity can interfere with that right. Thus, the Ninth Circuit has held that, "if pretrial publicity makes it impossible to seat an impartial jury, then the trial judge must grant the . . . motion for a change of venue." *Casey v. Moore*, 386 F.3d 896, 906 (9th Cir. 2004); *see also Gotbaum v. City of Phoenix*, 617 F. Supp. 2d 878, 881 (D. Ariz. 2008) (citing *Casey* and applying this standard in civil rights case).

There are two types of prejudice from pretrial publicity: presumed prejudice

and actual prejudice. Prejudice exists "where the record demonstrates that the community has been saturated with prejudicial and inflammatory media publicity . . . ." *Gotbaum*, 617 F. Supp. 2d at 881.

Not all publicity requires a change of venue. For example, courts have denied transfer requests when the publicity is "largely factual." *Id.* at 882; *Nat'l Fuel Gas Co. v. U.S. Energy Savings Corp.*, No. 07-CV-440A(F), 2008 WL 2405725, at *6 (W.D.N.Y. June 11, 2008) (denying motion to change venue where media coverage included only two old articles). But courts have found prejudice in high-profile cases, where a public official made inflammatory and prejudicial comments about a party. *Nevers v. Killinger*, 990 F. Supp. 844, 855-63 (E.D. Mich. 1997).

### B. The DA Has Tainted the Jury Pool

The DA's press campaign was not "largely factual." The DA presented a biased picture of the shooting, including a false description of the KECO video. The DA even called the reliability of the video into question.

The DA also made inflammatory comments about Fridoon, calling him a violent criminal and drug addict who was not taking his medication and had terrorized his family, implying that he brought the shooting upon himself. Fridoon's prior acts are not admissible; only the circumstances of what occurred that night are relevant. *Hyppolite v. Collins*, No. 11-CV-588 (WIG), 2015 WL 269219, at *1 (D. Conn. Jan. 21, 2015) (excluding evidence of plaintiff's criminal record in § 1983 case because officers did not know about it).

Similarly, Fridoon's drug use and mental condition cannot be used to show that Browder acted reasonably, as Browder did not know about any of that at the time. *See id.*; *Watts v. Hollock*, 2011 WL 6026998, at *2 (M.D. Pa. Dec. 5, 2011) (excluding evidence of plaintiff's use of marijuana on night before incident under Rule 403); *Del Grosso v. City of Philadelphia*, 2010 WL 3384822, at *3 (E.D. Pa. Aug. 20, 2010) (excluding evidence of plaintiff's prior heroin use, which occurred hours before altercation with police, because there was no tangible evidence that

1  plaintiff was intoxicated during altercation or that it affected his actions).

2  This situation is similar to the one in *Nevers*, where a white Detroit police
3  officer (Nevers) was convicted of murdering a black suspect (Green). The case
4  occurred shortly after the Rodney King verdicts. It received widespread press
5  coverage, most of which was negative and prejudicial toward the officer. 990 F.
6  Supp. at 847-48.

7  A federal court granted Nevers habeas relief based on inflammatory pre-trial
8  publicity. The media coverage there "was immediate and intense." *Id.* at 855. The
9  articles showed "a community that was deeply prejudiced as to [Nevers's] guilt."
10 *Id.* at 862. The articles were laced with inflammatory and gratuitous comments by
11 public officials. The mayor called Nevers a murderer. *Id.* The police chief also
12 made negative statements about Nevers and his partner. *Id.* at 863. Press articles
13 discussed inadmissible evidence. *Id.*

14 The same is true here. The DA made inflammatory public statements about
15 Fridoon. She held a press conference and distorted the evidence of the shooting.
16 She called Fridoon a violent criminal and drug addict. She is all over social media
17 with her biased message, coming from no less than the County's top lawyer.

18 The DA is an elected public official. She has great power and attention and
19 respect. She is the top prosecutor for San Diego County. Her word carries weight.
20 People believe her and trust her. When she talks, people listen.

21 As in *Nevers*, media coverage of the shooting now reflects the DA's message.
22 (Street Decl., Exh. G [editorial calling Fridoon a "menacing mentally ill man"
23 whose shooting was justified].) Also like in *Nevers*, this incident occurred during a
24 highly emotional environment. There have been many police shootings around the
25 country. The taint is indelible and is irreparably prejudicial.

26 **C.   The DA Violated Ethical Rules**
27 The DA's letter and media blitz were also unethical. They have created an
28 unfair and hostile environment for Plaintiffs in San Diego.

A "jury's verdict must be based on evidence received in open court, and not from outside sources." *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966). Thus, an attorney "shall not make an extrajudicial statement" – that is, a comment in the press about a case – "if [the attorney] knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." California Rule of Professional Responsibility 5-120.

This is a strict rule: an attorney may comment on certain information, like the status of an investigation or public records. *Id.* But an attorney cannot (1) "present[ ] information clearly inadmissible as evidence in the matter for the purpose of proving or disproving a material fact in issue," (2) "present[ ] information the member knows is false, deceptive, or the use of which would violate Business and Professions Code section 6068(d)" or (3) disclose confidential information. *Id.*, Discussion to Rule 5-120; *see also* ABA Model Rule Comments, § 1(also stating that lawyer should not discuss "expected testimony of a party or witness").

There are even *stricter* rules for prosecutors. "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." ABA Model Rules 3.8, comment. Thus, "except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose," a prosecutor should "refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and [should] exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule." ABA Model Rule 3.8.

Per Chief Deputy DA Paul Azevedo, "Prosecutors cannot properly make any out of court statements that a reasonable person would expect to be disseminated by means of public communication which the prosecutor knows or reasonably should

know will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the case. California Business and Professions Code section 6068. California Rules of Professional Conduct 5-120..." (Street Decl., Exh. LL, ¶ 6.) DA Dumanis plainly violated these ethical rules.

The DA also distorted the evidence of the shooting. She made inflammatory comments about the victim, Fridoon, and released inadmissible evidence. Her ethical breaches are over-the-top and underscore the prejudice to Plaintiffs.

The DA did not have to do those things to explain her decision. She could have just described the facts and her decision – like she did in the other seven letters we obtained. Indeed, the other letters are almost identical. They contain a description of the facts, plus the DA's decision. (Street Decl., Exh. JJ.) Fridoon's letter is the only one that discusses the victim's prior "acts," and the only one that encourages people to review the officer's shooting in light of inadmissible evidence.

It is the only letter that quotes the officer's performance reviews. It is the only letter that vouches for the officer's credibility. Unlike in other shootings, the DA spread her comments as widely as possible. She held a press conference and is all over social media. That was not necessary to explain her decision.

### D. Voir Dire Will Not Cure the Prejudice Caused by the DA

The Supreme Court has emphasized that, in trying to "cure" the effects of inflammatory pretrial publicity, the court must use "those remedial measures that will prevent the prejudice at its inception." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). Transferring this case outside San Diego is the way to do that.

Voir dire will not cure the prejudice. The City agrees. Per a declaration filed by the City's two trial consulting experts, "A thorough and probing voir dire may not be sufficient to overcome biases that media reports have generated." (Street Decl., Exh. MM, at 15, 17.) The DA's press conference, letter and tweets are permanently on the Internet. So are the articles and news stories reporting on them. They will be seen by many San Diegans by the time this case goes to trial.

During voir dire, we would have to ask potential jurors *specifically* about the DA's press conference, letter and tweets. This would alert potential jurors to the DA's statements and could cause them to go online and do their own searches. The DA has thus created a conundrum, which can only be remedied by transfer.

By contrast, people in Los Angeles or San Francisco are less likely to watch or read the San Diego news. They are less likely to know anything about the shooting and less likely to have seen the DA's inflammatory press campaign. *We will not have to ask them about the DA's diatribe.*

### E. Another District Will Not Be Inconvenient

The Nehads, Fridoon's parents and Plaintiffs, recently moved to Los Angeles. The executor of his Estate, also a Plaintiff, resides in Los Angeles. It will not be inconvenient for Plaintiffs to try this case outside San Diego. *See Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 980 (2d Cir. 1993) (listing factors to consider under 28 U.S.C. § 1404 transfer statute).

## IV. CONCLUSION

Plaintiffs respectfully request that the Court grant this Motion.

DATED: November 30, 2015          MILLER BARONDESS, LLP

By: _____
LOUIS R. MILLER
Attorneys for Plaintiffs S.R. NEHAD, K.R. NEHAD, and ESTATE OF FRIDOON RAWSHAN NEHAD