JAN I. GOLDSMITH, City Attorney
DANIEL F. BAMBERG, Assistant City Attorney
JOHN E. RILEY, Chief Deputy City Attorney
California State Bar No. 144268
BEVERLY A. ROXAS, Deputy City Attorney
California State Bar No. 298582
    Office of the City Attorney
    1200 Third Avenue, Suite 1100
    San Diego, California 92101-4100
    Telephone: (619) 533-5800
    Facsimile: (619) 533-5856

Attorneys for Defendants SHELLEY ZIMMERMAN,
NEAL N. BROWDER and the CITY OF SAN DIEGO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.R. NEHAD, an individual, K.R. NEHAD, an individual, ESTATE OF FRIDOON RAWSHAN NEHAD, <br><br> Plaintiffs, <br><br> v. <br><br> SHELLEY ZIMMERMAN, in her personal and official capacity as Chief RIGHTS UNDER 42 U.S.C. § 1983 of Police, NEAL N. BROWDER, an individual, CITY OF SAN DIEGO, a municipality, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 15cv1386 WQH (NLS) <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CHANGE VENUE** <br><br> Date:      January 11, 2016 <br> Time:      10:00 am <br> Judge:      Hon. William Q. Hayes <br> Court Room: 14-B (Annex) |

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................... 1

FACTS OF THE CASE ................................................................................ 2

A.   The District Attorney's Statements ................................................ 2

B.   Media Coverage ............................................................................... 4

C.   Plaintiffs' 12/28/2015 Supplemental Brief and Exhibits ................ 5

ARGUMENT ............................................................................................... 5

A.   Plaintiffs' Motion for Change of Venue is Premature ..................... 5

    1.   Saturation of the Media Market ............................................ 6

    2.   Ample Opportunity to Consider the Availability of
        Fair and Impartial Jurors ..................................................... 9

B.   Even if Plaintiffs' Motion were not Premature, the Cases
Discussing Pretrial Prejudice Cited by Plaintiffs do not
Support a Change of Venue ............................................................. 9

    1.   *Sheppard v. Maxwell* ......................................................... 10

    2.   *Casey v. Moore* ................................................................. 12

    3.   *Nevers v. Killinger* ........................................................... 13

C.   Under 28 U.S.C. § 1404 the Interest of Justice is Merely
One Factor for the Court's Consideration ...................................... 15

CONCLUSION .......................................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ainsworth v Calderon*
  138 F.3d 787 (9th Cir. 1998)..................................................................12

*Amini Innovation Corp. v. Bank & Estate Liquidator, Inc.*
  512 F.Supp.2d 1039 (S.D. Tex. 2007) ..................................................16

*Casey v. Moore*
  386 F.3d 896 (9th Cir. 2004).............................................................12, 13

*Columbia Broadcasting Systems v. U.S. Dist. Court for Cent. Dist. Of California*
  729 F.2d 1174 (9th Cir. 1984)............................................................7, 8

*Commodity Futures Trading Commission v. Savage*
  611 F.2d 270 (9th Cir. 1979)................................................................15

*Daniels v. Woodford*
  428 F.3d 1181 (9th Cir. 2005)........................................................6, 7, 9

*Gotbaum v. City of Phoenix*
  617 F.Supp.2d 878 (D. Ariz. 2008) .......................................................6

*Government of Canal Zone v. Thrush*
  616 F.2d 188 (5th Cir. 1980)..................................................................9

*Harris v. Pulley*
  885 F.2d 1354 (9th Cir. 1988) ...............................................................6

*Hayes v. Ayers*
  632 F.3d 500 (9th Cir. 2011) .................................................................6

*Los Angeles Memorial Coliseum Commission v. National Football League*
  89 F.R.D. 497 (C.D. Cal. 1981) ..............................................7, 9, 15, 16

*Murphy v. Florida*
  421 U.S. 794 (1975) ...............................................................................13

*Narten v. Eyman*
  460 F.2d 184 (9th Cir.1969)...................................................................6

*Nebraska Press Assn. v. Stuart*
  427 U.S. 539 (1976) .................................................................................6

*Nevers v. Killinger*
  990 F.Supp. 844 (E.D. Mich 1997) ............................................9, 13, 14

*Northern Indiana Public Service Co. v. Envirotech Corp.*
  566 F.Supp 362 (N.D. Ind. 1983)..........................................................7

*People v. Mackey*
  182 Cal. Rptr.3d 401 (Cal. Ct. Ap. 2015) ........................................6, 9

ii

## TABLE OF AUTHORITIES - Continued

**Cases**

*Piper Aircraft Co. v. Reyno*
  454 U.S. 235 (1981) ................................................................ 16

*Rideau v. State of Louisiana*
  373 U.S. 723 (1963) .................................................................. 6

*Sheppard v. Maxwell*
  384 U.S. 333 (1966) ...............................................9, 10, 11, 12

*Skilling v. U.S.*
  561 U.S. 358 (2010) .................................................................. 6

*United States v. Carona*
  571 F.Supp.2d 1157 (C.D. Cal. 2008) .................................... 7, 8

*United States v. Holder*
  399 F.Supp. 220 (W.D.S.D. 1975) .............................................. 7

*United States v. McDonald*
  576 F.2d 1350 (9th Cir.); *cert. denied* 430 U.S. 830 (1978) ............. 9

*Van Dusen v. Barrack*
  376 U.S. 612 (1964) ............................................................ 15, 16

**Statutes**

28 U.S.C. § 1404 .......................................................................... 15
28 U.S.C. § 1404 (a) ..................................................................... 15

**Rules**

Rule of Professional Conduct 5-120(B)(2) ................................... 15

Case No. 15CV1386 WQH (NLS)

## INTRODUCTION

"Presumed prejudice" is the threshold for a change of venue motion. This standard is a very high bar to such a motion. The law and the facts offered by Plaintiff at this stage of the litigation fall short of the legal standard necessary to support a change of venue. The pretrial conference in this matter is scheduled for February 3, 2017.

Plaintiffs' motion to change venue is "based upon the actions of the popularly-elected prosecutor for San Diego County." The motion takes to task District Attorney Bonnie Dumanis' November 9, 2015 press conference that coincided with the District Attorney's decision to not prosecute Officer Browder for the shooting at issue. Plaintiffs' motion, to a significant degree, speculates on the intentions and ethics of the District Attorney. The motion also offers Plaintiffs' view of the facts supporting liability.

On December 22, 2015, District Attorney Bonnie Dumanis held a second press conference coinciding with the release of the video evidence of this shooting. Regardless, the threshold for change of venue renders this request premature at best. More pertinent, however, is that Plaintiffs' argument falls short of an "extreme situation" whereby the venue was "saturated." A saturated venue implies absorption by the public such that it is indelibly imbedded in the minds of the jurors. Here, besides the one, and now two press conferences by Bonnie Dumanis, Plaintiffs simply offer a listing of media publications. There is no basis to determine who, in particular, read the listed articles. Instead, Plaintiff argues a "possible" scenario where the whole jury pool is now prejudiced against the decedent. Furthermore, the motion avoids discussing the media reports which were instituted or commented therein by Plaintiffs or Plaintiffs' counsel. Likewise, many of the publications cited by Plaintiffs attacked Officer Browder, the City and Chief Zimmerman.

///

///

# FACTS OF THE CASE

## A.    The District Attorney's Statements

Plaintiffs attempt to insert their theory of liability against the City of San Diego as evidence that District Attorney Dumanis' public statements have prejudiced the jury pool. The Defendants do not agree with Plaintiffs' account of the facts, or their characterization of the District Attorney's statements.  Moreover, Plaintiffs' view of facts are not relevant to deciding if the San Diego (or Los Angeles) jury pool is prejudiced against Plaintiffs. The facts presented by Plaintiffs to support liability contrast with many of the factual determinations of the District Attorney. That contrast is relevant only to the extent that Plaintiffs can demonstrate a resultant prejudice. District Attorney Dumanis' statements were not prejudicial, and an examination of the media coverage of this case demonstrates this lack of prejudice.

On November 9, 2015, the District Attorney issued a letter to Police Chief Shelley Zimmerman, summarizing the results of an internal review of Police Officer Neal Browder actions on April 30, 2015. The letter was made available to the public, as it is for every officer involved shooting in the County of San Diego. The internal review "does not examine . . . any issues related to civil liability." *Officer Involved Shootings*, SAN DIEGO COUNTY DISTRICT ATTORNEY (December 24, 2015, 11:13 AM), http://www.sdcda.org/office/officer-involved-shootings.html.

In the internal review of the instant officer involved shooting, the District Attorney emphasized what information would be available for a jury to review, if criminal charge were brought against Officer Browder.  It was within this context, and to inform the public about the District Attorney's decision not to press charges, that the decedent's prior acts of violence were discussed. The District Attorney did not provide this information in an attempt to vilify Plaintiff, but instead to point to a systematic problem in this country's healthcare system:

///

Nationwide, more than 11 million individuals cycle in and out of county-operated jails every year and up to 64 percent of them suffer from mental illness,' said DA Dumanis. 'People shouldn't have to wait until they land in jail or find themselves in a life-threatening situation to receive the mental health treatment and care they deserve.

Steve Walker and Tanya Sierra, *DA: SDPD Officer Believed Lives Were in Danger, is Legally Justified in Midway Shooting – DA Dumanis Calls for Improved Treatment for Mentally-Ill Homeless*, SAN DIEGO COUNTY DISTRICT ATTORNEY, http://www.sdcda.org/files/Midway%20OIS%20News%20Release %2011-9-15.pdf.

Plaintiffs' point to the District Attorney's discussion of decedent's mental health issues, drug use, and acts of violence against his own family as evidence of wrong doing. As discussed below, this evidence may be used in the upcoming 2017 trial to call into question the weight of Plaintiffs' losses under the wrongful death claim, however, it has also been discussed by Plaintiffs. Decedent's sister and mother gave an extensive interview to the press, noting his "paranoia," and "manic pattern." Their interview further addressed decedent's tendency to threaten his family during such episodes. *No Person . . . Can See That Video and Come to the Conclusion that My Brother Was Attacking a Police Officer*, Dec. 14, 2015, http://www.voiceofsandiego.org/topics/public-safety/no-person-can-see-that-video-and-come-to-the-conclusion-that-my-brother-was-attacking-a-police-officer/.

On December 22, 2015, in light of this court's decision to vacate the July 28, 2015, protective order, the District Attorney held another press conference. There, she provided the KECO security footage along with additional materials. District Attorney Dumanis took the time to explain to the press how these materials informed her earlier decision not to press charges against Officer Browder. The press conference focused on the information released to the press, the policy considerations underlying the release of such videos, and the Police Department's ongoing plans for the implementation of body cameras.

3

Finally, Plaintiffs argue that the District Attorney lied about the distance between Officer Browder and decedent at the time of the shooting, again alleging an attempt to prejudice the jury pool. This argument is so spurious it does not warrant the court's attention. The City of San Diego does not adhere to Plaintiffs' melodramatic statement of facts regarding the circumstances of the shooting. The enclosed Declaration of District Attorney Bonnie Dumanis regarding her factual findings is filed concurrently herewith, and demonstrates that the District Attorney merely reported the findings of an internal investigation.

**B.    Media Coverage**

Plaintiffs' attacks on District Attorney Dumanis' statements draws the courts attention away from the relevant factual focus of this Motion for Change of Venue – prejudice to the jury pool.

Although Plaintiffs have failed to provide any substantive analysis of the media coverage of this case, the City of San Diego requested an extensive analysis of the current media coverage and its absorption by the San Diego community.  The Declaration of William Rountree and Alexis Forbes "Decl. of Rountree/Forbes" is filed concurrently herewith.   Rountree and Forbes conducted an in-depth analysis of the *contents* of the current media coverage and examined the results of two surveys, each designed to elicit the San Diego community's awareness of the instant case and their opinion of Fridoon Nehad.

As Rountree and Forbes discuss, the District Attorney's statements on November 9, 2015, resulted in only a slight uptake in media coverage. In contrast, media coverage after the release of the KECO video increased significantly. Decl. of Rountree/Forbes ¶ 8. While Plaintiffs' allege that the District Attorney's November 9, 2015, press conference influenced the jury pool, again without any supporting analysis, Plaintiffs' own representative issued statements used in 20% of the media coverage in the last three months. Decl. of Rountree/Forbes ¶7.

Yet, neither of the press conferences nor Plaintiffs' media campaign has led

to prejudice in the San Diego community. Based on a survey conducted last week, more than 66% of San Diegans have not heard of Mr. Nehad's death. Decl. of Rountree/Forbes ¶21. Even among those who have heard of the decedent, 70% report neutral opinions. Decl. of Rountree/Forbes ¶16. Among respondents who are aware of Mr. Nehad, over 71% report either neutral or positive feelings towards his civil case. Decl. of Rountree/Forbes ¶17.

Moreover, an analysis of the contents of the media coverage demonstrates a similar lack of prejudice to the decedent's case. Instead, a content analysis performed by Rountree and Forbes indicated that 44% of articles published between September 1, 2015, and December 23, 2015, are categorized as negative towards *defendants*, while 43% were neutral. Decl. of Rountree/Forbes ¶6. Only 13% of articles portrayed the defendants in a positive light. As discussed below, the facts simply do not support Plaintiffs' allegations of prejudice.

**C.** **Plaintiffs' 12/28/2015 Supplemental Brief and Exhibits**

Plaintiffs' supplemental argument and exhibits, similar to their previous argument, attempt to impeach the District Attorney's integrity. The supplemental filing does not change the fact that Plaintiffs have not, and cannot, point to circumstances in this case which support a change of venue.

## ARGUMENT

Plaintiffs argue that venue must be transferred due to the District Attorney Dumanis' November press conference and the alleged resultant media bias. As discussed below, Plaintiffs' argument is unsupported by the relevant case law or the objective facts.

**A.** **Plaintiffs' Motion for Change of Venue is Premature**

In examining whether a change of venue is appropriate, the courts distinguish presumed prejudice, where "the record demonstrates that the community where the trial was held was saturated with prejudical [*sic*] and inflammatory media publicity about the crime," from actual prejudice, where "a court must determine if the jurors

demonstrated actual partiality or hostility that could not be laid aside." *Harris v. Pulley*, 885 F.2d 1354, 1361, 1363 (9th Cir. 1988).

"[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Skilling v. U.S.*, 561 U.S. 358, 384 (2010) (*citing*, *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976)(addressing prior restraints on publication)). Rather, "[a] presumption of prejudice because of adverse press coverage attends only the extreme case." *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011)(*citation omitted*).

To determine whether presumed prejudice can be demonstrated in a given case, two principals are applied:

> First, '[t]he presumed prejudice principle is rarely applicable and is reserved for an extreme situation.' *Harris*, 885 F.2d at 1361 (citation omitted); *see L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1400 (9th Cir.1984) (court should presume prejudice only where the community has been 'utterly corrupted by press coverage') (citation omitted). Second, courts are reluctant to presume prejudice too early in a case. As a general rule, 'the effect of pretrial publicity can "be better determined after the voir dire examination of the jurors.' *Narten v. Eyman*, 460 F.2d 184, 187 (9th Cir.1969) (citation omitted).

*Gotbaum v. City of Phoenix*, 617 F.Supp.2d 878, 881 (D. Ariz. 2008).

## 1. <u>Saturation of the Media Market</u>

Under the first principal announced by *Gotbaum*, the principal of presumed prejudice may apply where "the venue was saturated with prejudicial and inflammatory media publicity about the crime." *Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005)(citation omitted). Saturation requires more than "widespread, persistent, or even inflammatory, publicity; it implies *absorption* by the public" such that it is "'indelibly imbedded in the minds of the jurors'" *People v. Mackey*, 182 Cal. Rptr.3d 401, 443 (Cal. Ct. Ap. 2015)(*citing*, *Rideau v. State of Louisiana*, 373 U.S. 723, 730 (1963). In reaching this determination, the court considers three factors:

///

(1) whether there was a barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial.

*Daniels*, 428 F.3d at 1211.

The Ninth Circuit has also recognized that "in a large metropolitan area, prejudicial publicity is less likely to endanger the defendant's right to a fair trial." *Columbia Broadcasting Systems v. U.S. Dist. Court for Cent. Dist. Of California*, 729 F.2d 1174, 1181 (9th Cir. 1984); *see also U.S. v. Carona*, 571 F.Supp.2d 1157, 1161 (C.D. Cal. 2008) (holding "the size of the relevant community is an important factor . . . as large metropolitan areas are able to absorb the effects of prejudicial publicity in ways that smaller and more insular communities could not.").

Additionally, statistical evidence and opinion polls provide frequent support in examining whether the venue is saturated with prejudicial and inflammatory media publicity. *Los Angeles Memorial Coliseum Commission v. National Football League*, 89 F.R.D. 497, 509 (C.D. Cal. 1981); *see also Northern Indiana Public Service Co. v. Envirotech Corp.*, 566 F.Supp 362, 365-66 (N.D. Ind. 1983)(without statistical evidence or opinion polls evidence was insufficient to compel a conclusion that an impartial jury could not be empaneled); *c.f. United States v. Holder*, 399 F.Supp. 220, 228 (W.D.S.D. 1975)(finding survey data demonstrated a deeply felt community prejudice requiring transfer of venue).

Even a cursory examination of the factors examined by *Daniels*, *Columbia Broadcasting Systems*, and *Los Angeles Memorial Coliseum Commission* demonstrate that a transfer of venue is not warranted.

Turning first to the considerations announced in *Daniels*, 428 F.3d at 1211, District Attorney Dumanis' press release in November, more than a year before trial, contained a factual reporting of the contents of her investigation and supported by an independent consultant. Plaintiffs' hyperbolic description of the press release

cannot serve as a substitute for an actual examination. While Plaintiffs note the press release included information regarding decedent's attacks of his family, ongoing mental health struggles, and drug addiction, those issues would be admissible at trial to dispute the strength of Plaintiffs' wrongful death action. Moreover, decedent's mental health issues and history of familial violence was discussed by Plaintiffs.

Second, the Ninth Circuit has already recognized that in large communities, such as San Diego, prejudicial publicity is not as likely to effect the venireman as in a smaller, insular community, rendering transfer of venue less necessary. *Columbia Broadcasting Systems*, 729 F.2d at 1181. In the instant case, the San Diego community has ample time and opportunity to "absorb the effects of prejudicial publicity in ways that smaller and more insular communities c[an] not." *Carona*, 571 F.Supp.2d at 1161.

Finally, Plaintiffs have presented no evidence of absorption of any of the information that they presume is prejudicial. They offer no statistical data or opinion polling to show that the District Attorney's press release had any impact on the public, much less a negative impact on the public's impression of decedent, Fareed Nehad. Instead, Plaintiffs offer reams of articles, insults as to the District Attorney's character, and mere speculation.

In contrast, extensive inquiry by the City of San Diego and its experts demonstrate the lack of absorption, and more importantly, prejudice. See Decl. of Rountree/Forbes, discussed *supra*. Two-thirds of San Diegans have not heard of Mr. Nehad's death. Decl. of Rountree/Forbes ¶21. Even among those who have heard of the decedent, the vast majority, 70%, report neutral opinions. Decl. of Rountree/Forbes ¶16. Among respondents who are aware of Mr. Nehad, over 71% report either neutral or positive feelings towards his potential civil claims. Decl. of Rountree/Forbes ¶17.

This data demonstrates how far Plaintiffs fall short of the required standard.

The survey data noted above demonstrates that this case has barely pierced the consciousness of the community, much less that it is "'indelibly imbedded in the minds of the jurors'" *Mackey*, 182 Cal. Rptr.3d at 443. Nor is there a "wave of public passion," *Daniels*, 428 F.3d at 1211, when 70% of the community reports neutral feelings towards the decedent.

2. **Ample Opportunity to Consider the Availability of Fair and Impartial Jurors.**

Moreover, when considering whether it is appropriate to presume prejudice, the Ninth Circuit has consistently approved "waiting until voir dire to determine the availability of fair and impartial jurors." *Los Angeles Memorial Coliseum*, 89 F.R.D. at 508; *see Narten v. Eyman*, 460 F.2d at 187 (holding the "effect of pretrial publicity can be better determined after the voir dire examination of the jurors."); *United States v. McDonald*, 576 F.2d 1350, 1354 (9th Cir.); *cert. denied* 430 U.S. 830 (1978)(finding the "trial judge has a large discretion in gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial."). "If an impartial jury could not be selected that fact would have become evident at the voir dire." *Government of Canal Zone v. Thrush*, 616 F.2d 188, 190 (5th Cir. 1980)(adopting Government's position)(citation omitted).

Trial is more than a year away. There will be ample opportunity for the public to forget the District Attorney's press-release. The court is more than capable of executing a searching voir dire at that time, in accordance with the Ninth Circuit's explicit preferences. If actual prejudice exists at the time of trial the court can address the need for transfer at that juncture.

B. **Even if Plaintiffs' Motion were not Premature, the Cases Discussing Pretrial Prejudice Cited by Plaintiffs do not Support a Change of Venue**

Plaintiff cites to a line of cases, including *Sheppard v. Maxwell*, 384 U.S. 333 (1966), *Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004), and *Nevers v. Killinger*, 990 F.Supp. 844 (E.D. Mich 1997), to argue venue must be transferred. A review of the

9

underlying facts and holdings of each case demonstrates that they offer Plaintiffs no support for the instant motion.

### 1. _Sheppard v. Maxwell_

In _Sheppard_, Dr. Samuel Sheppard was charged with the murder of his pregnant wife. 384 U.S. at 335. From the very outset of the investigation, public officials made highly prejudicial statements which were reported to the community. _Id._ at 337 (noting corner's statement "it is evident the doctor did this, so let's go get the confession out of him."). Newspaper accounts of the crime and investigation continued unabated until trial and were incredibly inflammatory. A sampling of the five volumes of newspaper clippings collected by the Court included illustrative examples like "Doctor Balks at Lie Test; Retells Story," "Why No Inquest? Do It Now, Dr. Gerber," "Kerr (Captain of Cleveland Police) Urges Sheppard's Arrest," "Why Isn't Sam Sheppard in Jail," "Quit Stalling – Bring Him In," and "Dr. Sam Faces Quiz At Jail On Marilyn's Fear of Him." _Id._ at 338-342.

Moreover, the media participation in the investigation and trial was overwhelming. An inquest was conducted in the school gymnasium in front of a long table occupied by reporters. _Id._ at 339. As part of the inquest, Dr. Sheppard was searched by police in front of the press and several hundred spectators, while his counsel was prevented from participating in the three-day ordeal. _Id._ Before voir dire could even be conducted, the names of all 75 venireman was published by three Cleveland newspapers. _Id._ at 342. Later, the voir dire was staged and broadcast over the radio. _Id._ at 346. Nor was the jury protected from the press once trial began – the jurors "were constantly exposed to the news media." _Id._ at 345. The trial court refused to restrict prejudicial new accounts, and instead invited the press to sit at a long table, inside the bar of the court. _Id._ at 343.

In finding a denial of Sheppard's due process rights, the Supreme Court distinguished the effects of pretrial publicity alone, from the effect of such publicity coupled with media participation in the courtroom:

> While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone, the court's later rulings must be considered against the setting in which the trial was held. In light of this background, we believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of that 'judicial serenity and calm to which (he) was entitled.

*Id.* at 354-55 (citation omitted).

The facts of the instant case are far removed from those of *Sheppard*. Instead of a media frenzy aimed at the incarceration of a defendant coupled with ample opportunity to speak to and influence an existing jury, the only support Plaintiffs offer for the instant change of venue motion is their biased and argumentative attack on District Attorney Dumanis' November press-release.

Similar shrill arguments could be made regarding the attempt of Plaintiffs to bias the jury pool through their statements to the press. Liam Dillon, *No Person . . . Can See That Vide and Come to the Conclusion that My Brother Was Attacking a Police Officer*, Dec. 14, 20155, http://www.voiceofsandiego.org/topics/public-safety/no-person-can-see-that-video-and-come-to-the-conclusion-that-my-brother-was-attacking-a-police-officer/; Dana Littlefield, *Family Files Claim Over Fatal Police Shooting*, May 29, 2015, http://www.sandiegouniontribune.com/news/2015/may/29/family-files-claim-officer-fatal-shooting-midway/ (arguing the police department "are covering up what happened, circling the wagons, or so it would appear, and refusing to be up front . . ."); and Cristin Severance, *Team 10: Claim Filed in Midway Shooting, Lawyer Says Cop Had 'No Reason to Use Deadly Force'*, May 28, 2015, http://www.10news.com/news/team-10/claim-cop-had-no-reason-to-use-deadly-force (accusing the D.A.'s office of a "cover-up").

In the instant case there is no substantive analysis demonstrating that the media coverage has been so biased as to warrant a change of venue. Rather, the evidence demonstrates the opposite. Over 71% of those who have heard of decedent feel either neutral or favorable towards his possible civil claim against the

City of San Diego and Officer Browder. Decl. of Rountree/Forbes ¶17.

However, this court should also look to the crux of the Court's holding in *Sheppard* – that a refusal to take any precaution regarding media influence, coupled with an unrestrained media presence in the courtroom, "caused Sheppard to be deprived of that 'judicial serenity and calm to which (he) was entitled." 384 U.S. at 354-55. The media presence in the instant case is simply not that fulsome, and there is no reason to believe that this court would so disregard the interests of a fair trial as to allow the press to literally invade the bar of the court at trial.

## 2. *Casey v. Moore*

On October 11, 1998, Rosemary Casey was shot and killed by a bullet fired from her husband John Casey's hunting rifle. *Casey v. Moore*, 386 F.3d 896, 901 (9th Cir. 2004). John claimed the shooting was accidental. The Caseys lived in Wenatchee, Washington, in a county of 60,000 possible jurors. *Id.* at 902. All alleged publicity came from the only daily newspaper, the Wenatchee World, with a circulation of approximately 30,000. *Id.*

John Casey claimed that that a combination of local press and local gossip, combined with his small community, so captured the attention of the venue's possible jurymen that it was "antithetical to a fair trial." *Id.* at 905.

In determining that Casey had not proven such prejudice the Court re-examined the *Sheppard* standard – finding that a presumption of prejudice is warranted where "there was a barrage of inflammatory publicity immediately prior to trial amounting to a huge wave of public passion." *Id.* at 907 (*citing Patton v. Yount*, 467 U.S. 1025, 1033 (1984). Prejudice is less likely to be found where "the media accounts were primarily factual, as such accounts tend to be less prejudicial than inflammatory editorials or cartoons." *Id.* (*relying on Ainsworth v Calderon*, 138 F.3d 787 (9th Cir. 1998)).

The Ninth Circuit noted that despite the allegations of prejudice, "nobody in the jury admitted to having formed a predisposition based on rumor." *Id.* at 909.

12

Noting the holding of *Murphy v. Florida*, 421 U.S. 794 (1975) – "[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard" – the Court found that the trial judge's careful and cautious assessment of potential jurors was entitled to a presumption of correctness. *Id.* at 910.

Rather than supporting Plaintiffs' Motion for Change of Venue, the *Casey* decision supports the City of San Diego's position that this motion is premature. The District Attorney's statement, made more than a year before trial, cannot be considered "a barrage of inflammatory publicity immediately prior to trial amounting to a huge wave of public passion," requiring a venue transfer. *Casey*, 386 F.3d at 907. Instead of presuming that the jury of a large metropolitan area would be prejudiced by a statement made well before trial, the Ninth Circuit has expressed its belief that "a trial judge's careful and cautious assessment of potential jurors," during the voir dire process, can amply demonstrate a jury's impartiality. *Id.* at 910. Therefore, *Casey* provides no support for Plaintiffs' position in the instant case.

### 3.   *Nevers v. Killinger*

In *Nevers v. Killinger*, 990 F. Supp. 844 (1997), a Detroit police officer and his partner were charged with second-degree murder after severely beating an unarmed citizen, Malice Green, who ultimately died.

The media attention surrounding this event was both "immediate and immense." *Id.* at 855. Prior complaints against Nevers were reported by the media, and Nevers was linked to a controversial undercover police unit which had been disbanded for its alleged harassment of young black men. *Id.* Prior allegations of brutality by Nevers and his partner were also reported at length. *Id.* at 857. Nevers' and his partner's purported nickname – Starsky and Hutch – was adopted in media accounts, an apparent reference to their reputation as hard line officers. *Id.* at 855.

Notably, the court found that the "pretrial publicity continued almost unabated from the first article . . . to the beginning of voir dire." *Id.* at 862. This included extensive media reports shortly before trial, regarding the potential for "rioting in the event that the defendants were acquitted." *Id.* at 863.

A civil suit, filed days after Green's death, was settled by the City of Detroit within two months, for $5.25 million. This figure was reported by The Detroit News and accompanied by commentary indicating that the settlement was unusually swift. *Id.* at 861.

Significantly, the officers' conduct was repeatedly condemned by public officials. Two days after Green's death the City Council President described the officers' conduct as "unprofessional," and "engage[d] in brutality." *Id.* at 856. Former Mayor Charles Young referred to Nevers and his partner as "Starsky and Hutch in Detroit," and later commented that Green "was literally murdered by police." *Id*. at 859, 862. Months later Young continued to comment on the case, linking Green's death to the controversial and disbanded undercover STRESS group of police officers. *Id.* at 862.

Chief of Police, Stanley Knox, made a number of prejudicial statements regarding the need to prepare for and avoid the type of violence that had recently rocked Los Angeles in the wake of the Rodney King acquittal. *Id.* 863. However, the Court noted that the "most prejudicial statement," was when "[w]ithin hours of the incident, Knox suspended all seven officers at the scene without pay and before any investigation." *Id.* The result of this hasty action "was plain; within hours of the incident, the seven officers were indicted, tried, found guilty, and suspended in the name of riot prevention." *Id.*

In the instant case, Plaintiffs point to statements, by one official, over a year before trial, as comparable to the repeated hounding of police officers in the *Nevers* case. The differences are astounding. District Attorney Dumanis' statements were made only with regard to her determination that criminal charges would not be

14

brought against Officer Browder and the reasoning underlying that determination. The District Attorney never mentioned or opined on the validity of this civil case.

Moreover, any implication that the District Attorney's statement is unethical, an issue completely unaddressed by the *Nevers* decision, and an apparent attempt by Plaintiffs to conflate issues, is easily overcome by quick reference to California Rule of Professional Conduct 5-120(B)(2). Section 5-120(B)(2) provides that a member of the California bar can comment when the information conveyed is contained in a public record. Here, the District Attorney made a public statement regarding a letter available to the public after any police officer involved shooting. Her comments fall well within the purview of Section 5-120(B)(2).

Finally, the explicit tension and fear in the Detroit community leading up to the Nevers trial is distinguishable from the circumstances of the instant case. There is no similar risk of rioting should the Plaintiff be *awarded* damages by a San Diego jury. Nor is there any media speculation to that effect.

## C. Under 28 U.S.C. § 1404 the Interest of Justice is Merely One Factor for the Court's Consideration

While Plaintiffs' motion focuses almost exclusively on the doctrine of presumed prejudice, prejudice is merely one factor in the relevant 28 U.S.C. § 1404 analysis. Section 1404(a) provides "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The burden of justifying a transfer of venue rests with the moving party. *Los Angeles Memorial Coliseum Commission v. National Football League*, 89 F.R.D. 497, 499 (C.D. Cal. 1981); (*citing Commodity Futures Trading Commission v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979)). Moreover, Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient." *Van Dusen v. Barrack*, 376 U.S. 612, 645-646 (1964).

///

To determine whether transfer is warranted under this balancing test, courts examine a number of public and private factors, including:

> (1) the convenience of parties and witnesses; (2) the cost of obtaining attendance of witnesses and other trial expenses; (3) the availability of compulsory process; (4) the relative ease of access to sources of proof; (5) the place of the alleged wrong; (6) the plaintiff's choice of forum; (7) the possibility of delay and prejudice; (8) administrative difficulties flowing from court congestion; (9) the local interest in having localized interests decided at home; (10) the familiarity of the forum with the law that will govern the case; (11) the avoidance of unnecessary conflict of law problems; and (12) the interests of justice in general.

*Amini Innovation Corp. v. Bank & Estate Liquidators, Inc.*, 512 F.Supp.2d 1039 (S.D. Tex. 2007); *see also*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981). In the California these individual concerns have been stated more generally as "(1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; and (4) the interests of justice." *Los Angeles Memorial Coliseum*, 89 F.R.D. at 499.

An examination of these factors amply demonstrates that venue should not be transferred. The location of the alleged wrong is here in San Diego and the community has an interest in resolving this dispute at home – especially since it alleges the wrong doing of a public servant. The witnesses, including all Defendants, as well as those threatened by decedent on the night of his death, are universally located in San Diego. Transfer to a venue like Los Angeles, slightly more than 100 miles to the north, would impede the ability of both parties to call San Diego witnesses to testify. Plaintiffs chose to sue in San Diego, and presumably this court's retention of the case cannot be considered an inconvenience to them.

Moreover, Plaintiffs have not shown that any factor weighs in *favor* of transferring venue as required by *Van Dusen*, 376 U.S. at 645-646. Plaintiffs have failed to demonstrate any existing prejudice, as discussed at length above, and therefore the interests of justice to do not favor transfer. Moreover, Plaintiffs

16

voluntary relocation to the Los Angeles area does not demonstrate that a change of venue would result in increased convenience for the parties. Rather, the difficult in calling witnesses to Los Angeles, as well as the costs associated with transporting party witnesses and evidence to a different venue, all indicate that venue should not be transferred.

**<u>CONCLUSION</u>**

A change of venue is warranted only under extreme circumstances. The circumstances of this matter fall short of any measure, in the law or facts, to support this motion.

Dated:  December 29, 2015     JAN I. GOLDSMITH, City Attorney

By  */s/ John Riley*
     John Riley
     Chief Deputy City Attorney

Attorneys for Defendants
SHELLEY ZIMMERMAN, NEAL N. BROWDER AND CITY OF SAN DIEGO

17