LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
DANIEL S. MILLER (State Bar No. 218214)
dmiller@millerbarondess.com
SCOTT J. STREET (State Bar No. 258962)
sstreet@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

BRIAN E. WATKINS (State Bar No. 190599)
bwatkins@brianwatkinslaw.com
BRIAN E. WATKINS & ASSOCIATES
925 B Street, Suite 402
San Diego, California 92101
Telephone: (619) 255-5930
Facsimile: (619) 255-5639

Attorneys for Plaintiffs S.R. NEHAD, K.R. NEHAD, and ESTATE OF FRIDOON RAWSHAN NEHAD

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.R. NEHAD, an individual, K.R. NEHAD, an individual, ESTATE OF FRIDOON RAWSHAN NEHAD, an entity,<br><br>Plaintiffs,<br><br>v.<br><br>SHELLEY ZIMMERMAN, in her personal and official capacity as Chief of Police, NEAL N. BROWDER, an individual, CITY OF SAN DIEGO, a municipality, and DOES 1 through 10, inclusive,<br><br>Defendants. | **CASE NO. 15-cv-1386-WQH-NLS**<br><br>[Assigned to the Hon. William Q. Hayes]<br><br>**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO CHANGE VENUE**<br><br>Date: January 11, 2016<br><br>[HEARING REQUESTED] |

## I. INTRODUCTION

There is no question that pre-trial publicity *can* interfere with a party's right to a fair trial in a civil case. In their opposition, Defendants ignore the detailed factual basis for Plaintiffs' Motion. The Motion is based on the highly unusual, inflammatory media campaign by the District Attorney of San Diego County, Bonnie Dumanis, against the victim of this shooting.

In her press campaign, the DA has gone out of her way to demonize Fridoon and to defend the police officer shooter. She is on a mission to convince the public that the shooting was justified and that Fridoon is to blame for it. She is, in effect, carrying the Defendants' water in the media.

DA Dumanis' *first* press conference, and the accompanying publicity, were biased and misleading. The DA speculated that Fridoon knew Browder was a police officer (the evidence indicates otherwise). She called Fridoon "not someone who could be reasoned with" and identified prior incidents involving Fridoon despite their not being admissible into evidence.

The DA's *second* press conference went even further. A day *before* the Protective Order expired, she called in the press and gave an "opening statement" on behalf of the Defendants. She released evidence she said was favorable to Browder. She walked reporters through the evidence. She withheld evidence supporting Plaintiffs.

The DA's media campaign saturated the community. The press conferences were the lead stories on television and radio news stations throughout San Diego. The DA's edited version of the shooting video, released at the second press conference, was posted on YouTube and has been viewed over 47,000 times already. Reporters posted other videos on their websites. It is all permanently on the Internet. DA Dumanis broadcast her comments as widely as possible, also posting them on her website and on Facebook and Twitter.

This is not routine news coverage. It is aggressive, unprecedented advocacy

by San Diego's public prosecutor, a County-wide elected official. The *Voice of San Diego* newspaper has described DA Dumanis as San Diego County's "most powerful politician." (*See* Exh. A to this Brief.)

"[T]he typical case requiring a transfer of venue involves a crime, such as rape or murder, that is likely to evoke a visceral response from the public." *United States v. Carona*, 571 F. Supp. 2d 1157, 1160 (C.D. Cal. 2008). A police shooting qualifies. Police violence is one of the most polarizing issues in America. That is why every television station in San Diego broadcast DA Dumanis' press conferences. Several even streamed it live. The stories about the DA's press conferences have generated thousands of citizen comments.

The DA's media campaign continues to generate publicity. By the time this case goes to trial, most people in San Diego will have seen or heard it. In voir dire, we will have to ask potential jurors about the DA's comments. This is an unfair and unacceptable situation for selecting a jury in San Diego.

## II. ARGUMENT

Pre-trial publicity can interfere with a party's right to a fair trial in a civil case. *Casey v. Moore*, 386 F.3d 896, 906 (9th Cir. 2004); *Koch v. Koch Indus., Inc.*, 2 F. Supp. 2d 1409, 1412 (D. Kan. 1998). The test focuses on what's called "presumed prejudice."

Presumed prejudice exists if: *First*, the venue has been saturated with publicity—*i.e.*, it is probable that most of the community knows about the publicity and will be influenced by it. *Second*, the publicity is inflammatory—it does not just report the facts of the case but contains opinions and advocacy and addresses matters not admissible at trial. *Gotbaum v. City of Phoenix*, 617 F. Supp. 2d 878, 881 (D. Ariz. 2008).

### A. The DA's Press Conferences Saturated San Diego

The DA's press campaign was extraordinary. DA Dumanis held two press conferences to discuss the shooting. (Declaration of Scott J. Street, dated Nov. 30,

2015 ("Street Decl."), Exh. E; Supplemental Declaration of Scott J. Street, dated Dec. 28, 2015 ("Suppl. Street Decl."), Exh. A.) She released videos of those press conferences. She posted the press conference videos on her website, Facebook and Twitter. (Street Decl., Exh. F; Suppl. Street Decl., Exh. B.)

Every newspaper, television and news radio station in San Diego covered DA Dumanis' press conferences. (Street Decl., Exhs. G-N; Suppl. Street Decl., Exhs. C-K.) They were the lead stories on the evening news. The stories are permanently on the Internet. They have been viewed by thousands of people and will be viewed by thousands more before this case goes to trial.

The DA gave her edited and scripted version of the shooting video (as well as other videos from the night of the shooting) to reporters. (Suppl. Street Decl., ¶ 4.) The DA's version of the video was posted on YouTube and is being viewed by thousands of people. (*Id.*) The DA's other scripted videos were posted on news websites. (*Id.*, Exhs. E-I.) Like the articles, they are permanently on the Internet and will be seen by many people before trial.

This extensive publicity, and the DA's efforts to put out her message, distinguishes this case from those the Defendants cited. For example, in *United States v. Carona*, the defendants were charged with crimes related to an alleged conspiracy to use the Orange County sheriff's office to enrich themselves. The case received publicity in Southern California. 571 F. Supp. 2d at 1158-59.

The defendants moved to change venue. The court denied the motion. It noted that, "[w]hile there has clearly been heightened public interest in this case, such interest is expected when a prominent elected official is charged with criminal wrongdoing." *Id.* at 1160. It also found that the white-collar crimes charged in the case "are of a character less likely to incite a wave of public passion" than a murder or sex crime. *Id.* (quotations omitted).

Most of the media attention in the *Carona* case was "unremarkable." The only thing that was unusual were comments by a salacious talk radio host,

"encourag[ing] potential jurors to conceal their biases toward Defendants during the jury selection process in an effort to increase the likelihood that they will be chosen for the jury in this case, and to unthinkingly find Defendants guilty if selected to the jury." *Id.* at 1159.

Unlike *Carona*, the publicity in this case is unique and far more extensive. In her press conferences, the DA went beyond announcing her decision not to charge Officer Browder. She essentially gave an opening statement on behalf of the Defendants. She broadcast her views as widely as possible and gave separate interviews to television and radio stations.

Bonnie Dumanis is a powerful, high-profile public official in San Diego, formerly a Judge and four times elected District Attorney. She is the County's chief prosecutor. People know and respect her; and they listen to her. Her word and her views carry substantial weight within San Diego. She is an aggressive, upwardly mobile public figure who has even run for Mayor. This case is very different from the *Carona* case or, for that matter, any other pre-trial publicity case we could find.

Defendants contend that we had to conduct a survey to support a change of venue. They are wrong. The Ninth Circuit does not require a survey, and there is no need for a survey here. Dumanis, the "most powerful politician" in San Diego County, is also a possible candidate for California Attorney General.

Police violence is one of the most high-profile and polarizing issues in America today, as evidenced by the response to shootings in Baltimore, Chicago and Cleveland. This is the type of case that generates widespread publicity and evokes a visceral response from the public.

"[A] large percentage of San Diegans watch the news . . . ." Ron Donoho, "The British Are Coming . . . with Microphones?", *San Diego Magazine*, Oct. 2007, p. 58. Thus, it is reasonable to believe that most potential jurors will have seen or heard about DA Dumanis' media campaign by the time this case goes to trial.

### B. The DA Is Not Just Reporting the Facts of the Shooting

The DA's press campaign was not "largely factual." That is another critical distinction between this case and those cited by Defendants.

In *Carona*, the court found that "most of the media attention in this case has been unremarkable." 571 F. Supp. 2d at 1159. The same was true in the antitrust case that the Los Angeles Coliseum Commission filed against the NFL. *L.A. Memorial Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 497 (C.D. Cal. 1981). There, the NFL sought to change venue—to move the case out of L.A.—because of negative pre-trial publicity. But the court found that "many of the articles filed with this court appear to contain straightforward and neutral reports on the progress of this litigation." *Id.* at 502.

This case is not like the *Coliseum* case, *Carona* or any of the other cases that Defendants cited. The Motion is not based on straightforward news reports. It is based on the dishonest and negative media campaign that has been waged by a high-profile, powerful public official.

Defendants do not provide any justification for DA Dumanis' actions, particularly her second press conference. They ignored most of the DA's comments and argued, in conclusory fashion, that everything she said was neutral and factual.

But the DA did not just recite the facts of the shooting. She took Browder's side. She said that Browder "didn't have time to assess whether [the object Fridoon was holding] was a pen or a knife" and that he "didn't have time" to look for or use another weapon. (Suppl. Street Decl., Exh. A ["DA Video"], Disc 2, at 9:50, 10:20.) That is the DA's *opinion* about central issues in this case.

The DA also *portrayed* the facts in a way that defended Browder and demonized Fridoon. For example, she said that Fridoon crossed the alley "to head directly toward Officer Browder" (*id.* [Disc 1] at 18:25) – suggesting (falsely) that Fridoon was trying to attack Browder. She also showed a bizarre YouTube video with a man (not Fridoon) twirling a butterfly knife in a threatening manner. (*Id.*

[Disc 1] at 19:40.) And she *withheld* evidence that is favorable to Plaintiffs, such as Browder's inconsistent statements about not seeing, then reversing course and seeing, a knife.

The DA released information about Fridoon that is not admissible in this case, such as the prior incidents discussed in the Motion. (Motion, at 10-11.) Dumanis continues to say that such evidence would have been admitted in a criminal trial, but this is a civil case; and she is wrong in any event. *See People v. Tafoya*, 42 Cal. 4th 147, 165 (2007) (holding that evidence that victim was dangerous was relevant to defendant's claim of self-defense "only if defendant knew of victim's reputation for dangerousness and was afraid of him").

The DA's comments are comparable to the conduct in *Nevers v. Killinger*, 990 F. Supp. 844 (E.D. Mich. 1997), where the court held that the case should have been transferred. *Nevers* found a constitutional violation because public officials, including the mayor and police chief, demonized the defendants and encouraged the public to convict them. *Id.* at 855-63. DA Dumanis is doing the same thing.

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005), is also instructive. There, in granting habeas corpus relief, the Ninth Circuit held that the state trial court should have transferred the case to a different venue because of inflammatory pre-trial publicity. The court emphasized that the publicity "included editorials and letters to the editor calling for Daniels's execution. In addition, news articles *reflected the prosecution's theory of the case* by attributing the killings to Daniels's desire to escape justice. Also publicized by the press was Daniels's past criminal offenses, including an arrest for shooting at a police officer" which were not admissible at trial. *Id.* at 1212 (emphasis added).

A similar thing happened here. A high-level public official has used – and is using – her bully pulpit to spread law enforcement's theory of the case. She publicized information that is not admissible and encouraged the public to rely on it and to find that Browder acted reasonably. She even called out Fridoon's family,

calling them his "most frequent victims." (Street Decl., Exh. C.) The DA is trying Defendants' case in the media.

Why else would DA Dumanis hold the second press conference? Her role in the case was finished after she declined to charge Browder. As one reporter who attended that press conference noted: "The press conference served no purpose but to plaster [Fridoon] as deserving of what he got." Scott Lewis, "The Trial of Fridoon Nehad," *Voice of San Diego*, Jan. 4, 2016, http://www.voiceofsandiego.org/topics/public-safety/the-trial-of-fridoon-nehad/?google_editors_picks=true.

This is not the way a public prosecutor is supposed to act. When a grand jury in Cleveland decided not to indict the police officer who shot Tamir Rice, the prosecutor said "this was a perfect storm of human error, mistakes and miscommunication" but that the law gives the benefit of the doubt to the police so the shooting "did not constitute criminal action . . . ." Timothy Williams & Mitch Smith, "Cleveland Officer Will Not Face Charges in Tamir Rice Shooting Death," *N.Y. Times*, Dec. 28, 2015, http://www.nytimes.com/2015/12/29/us/tamir-rice-police-shootiing-cleveland.html.

The Cleveland prosecutor informed the victim's family of the decision, and explained it to them, before making the decision public. He did not demonize the victim or blame him for the shooting. DA Dumanis did the opposite.[1]

C. **Voir Dire Will Not Cure the Prejudice**

In most cases, the Court can wait until voir dire to assess the effect of pre-trial publicity. But voir dire will not be effective here. We would have to single out the

---

[1] Defendants also cited several cases in which parties tried to use pre-trial publicity to restrain the press. *See Nebraska Press Association v. Stuart*, 427 U.S. 539, 569 (1976); *Columbia Broadcasting Sys. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 729 F.2d 1174, 1179-80 (9th Cir. 1984). Plaintiffs are not asking for a prior restraint on the press, so those cases are inapposite.

DA and ask potential jurors about her comments. For example, here are some questions we will have to pose to a San Diego jury:

- "Did you see the DA's first press conference, in which she declined to charge Officer Browder with a crime?"
- "Did you see the DA's second press conference, in which she released the video of the shooting?"
- "Are you aware that the DA said Browder did not have time to determine whether the object Fridoon had in his hand was a pen? Could you put that aside and decide the issue yourself?"
- "Did you see the video of a man wielding a butterfly knife, which the DA showed at her second press conference?"
- "Are you aware of any of the prior incidents involving Fridoon, which the DA mentioned in her press conferences and her November 9, 2015 letter? Could you put those aside and decide this case without considering them?"

These questions will alert potential jurors to the DA's statements and opinions about the case. They could cause the jurors to Google the DA's comments. It is a no-win situation. Ironically, Defendants agree: they said the same thing when they were trying to suppress the shooting video from the public. (Street Decl., Exh. MM, at 15, 17.) Here, greatly compounding the problem, it is the County DA who so publicly went on the war path.

Courts have found that "when the probability of prejudice is great under the circumstances, the efficacy of examining the jurors during voir dire is diminished." *N. Indiana Pub. Serv. Co. v. Envirotech Corp.*, 566 F. Supp. 362, 365 n.2 (N.D. Ind. 1983) (citing *Groppi v. Wisconsin*, 400 U.S. 505 (1971)). That is the case here. In this case, there are the shooting claims, plus claims for *Monell* and supervisory liability. Voir dire will not—cannot—neutralize the DA's inflammatory media campaign. For those who didn't hear it, voir dire will alert them to it. *See id.*

(holding that "[b]ecause this is a complex case requiring extensive discovery and preparation, the Court is of the opinion that deferring a determination of prospective juror bias until voir dire is utterly unworkable based on time, energy, and cost considerations").

Voir dire outside San Diego can be effective. We could ask potential jurors if they have seen or heard *any* news coverage of the shooting. We would not have single out the DA and would not alert the jurors to her inflammatory comments.

### III. CONCLUSION

Plaintiffs respectfully request that the Court grant the Motion and transfer this case to another district within California.

DATED: January 5, 2016

Respectfully submitted,

MILLER BARONDESS, LLP

By: _____
LOUIS R. MILLER
Attorneys for Plaintiffs S.R. NEHAD,
K.R. NEHAD, and ESTATE OF
FRIDOON RAWSHAN NEHAD