# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.R. NEHAD, an individual, K.R. NEHAD, an individual, ESTATE OF FRIDOON RAWSHAN NEHAD, <br><br> Plaintiffs, <br> v. <br> SHELLEY ZIMMERMAN, in her personal and official capacity as Chief of Police, NEAL N. BROWDER, an individual, CITY OF SAN DIEGO, a municipality, and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO. 15cv1386 WQH - NLS <br><br> ORDER |

HAYES, Judge:

The matter before the Court is the motion for summary judgment (ECF No. 116) filed by Defendants Neal N. Browder, Shelley Zimmerman, and the City of San Diego.

## BACKGROUND

On August 28, 2015, Plaintiffs S.R. Nehad, K.R. Nehad, and the Estate of Fridoon Rawshan Nehad (collectively "Plaintiffs") filed a Second Amended Complaint. Plaintiffs allege that Defendant Neal N. Browder is liable under 42 U.S.C. § 1983 for violating the Fourth Amendment rights of Fridoon Rawshan Nehad ("Nehad") by using excessive force and for violating the Fourteenth Amendment rights of S.R. Nehad and K.R. Nehad by depriving them of the companionship of their child. Plaintiffs further allege a § 1983 *Monell* claim against the Chief of Police Shelley Zimmerman and the City of San Diego and a § 1983 *Monell* claim for failure to supervise against

Zimmerman. Plaintiffs allege claims under state law against all Defendants.

**FACTS**

Just after midnight on April 30, 2015, an individual clerking at an adult bookstore store in the Midway District of San Diego called 911 dispatch to report that a man had threatened him with a knife. Police dispatch asked the clerk to stay on the line and immediately put out a broadcast that a suspect was threatening people with a knife. The suspect was described as an Asian or Hispanic man, between fifty or sixty years old, wearing a red shirt and gray sweater. The "hot call" was assigned the highest priority possible by dispatch. Because this was a high risk situation, dispatch activated the Emergency Tone to limit radio traffic.

Officer Browder responded to the call. Officer Browder was first on the scene and initially saw two civilians in the parking lot. Officer Browder made a left turn into an alley, turned his headlights to high beam, and stopped his vehicle. Officer Browder saw the suspect in the alley walking toward his vehicle. Officer Browder confirmed the description of the suspect by communicating with dispatch.

Officer Browder observed the suspect cross from the left side of the alley to the right side of the alley and advance toward him. Officer Browder testified,

> [] I initially saw Fridoon as he was approaching the car, then I confirmed the description with communications. . . . [A]fter I confirmed that he was the right person that I had, that's when I noticed that it appeared to me that he had a knife in his hand, and that's when I threw the mic in the passenger seat and then put the car into park, and that's when I got out of the car.

(ECF No. 118 at 9).

Officer Browder exited his marked patrol car and drew his handgun. Officer Browder was carrying a taser, mace, and a collapsible baton at the time he exited his patrol car. Officer Browder took a step to the left and closed the door. Officer Browder testified "When I saw him as he was aggressing me, he didn't slow down. . . . it appeared to me he was definitely focusing on me and was walking toward me with that purpose – with a purpose . . . I felt that he was walking – he was walking to stab me with the knife because that's what I saw. That's what I saw in his hand." (ECF No. 118

at 13). Officer Browder testified that Nehad was holding a "pointy metallic object" in his hand, "his arm was bent and it appeared that it was – the weapon was being pointed at me." *Id*. at 16-17. Officer Browder testified at his deposition as follows:

> Q: Did he make any threatening gesture towards you?
> A: Can you explain what you mean by "threatening"?
> Q: Did he ever ... did he raise his arm above his head at any point in time?
> A: No.
> Q: Did he make any thrusting motion with either of his arms?
> A: Well, he had what appeared to me the knife in his hand, and it was held in this manner here...
> Q: And when you observed that, about how far away was he from you, if you could estimate?
> A: I'd estimate... maybe a car length, a car length and a half.

(ECF No. 138-3 at 87-88). Officer Browder fired his handgun hitting Nehad in the chest. No weapons were found at the scene. Nehad had a pen in his hand.

Officer Browder testified at his deposition that he did not recall saying anything to the suspect prior to firing his gun. Three witnesses at the scene gave testimony that they heard Officer Browder give a verbal warning to Nehad prior to firing his weapon. One witness testified that he heard Officer Browder say "Stop" and "Drop it" "two to three times" before he heard a gunshot. (ECF No. 118-1 at 4). The witness who reported the threat to dispatch testified that he heard the police officer say "something along the lines of 'Stop. Drop it,' and then I heard the gunshot." (ECF No. 117-3 at 8).

A witness who was approximately ten steps from Officer Browder at the time of the shooting, testified that he observed Officer Browder put his hand out in a gesture to tell the suspect to stop. The witness testified that the suspect was "fiddling with something in his midsection" about ten steps from Officer Browder walking toward Officer Browder. (ECF No. 118-2 at 4-5). The witness stated, "It wasn't in an aggressive manner." *Id.* at 5. The witness testified:

> Q: And you testified the object you saw that he was fiddling with in his left hand, you weren't sure what it was –
> A: No. . . . But he was fiddling with it and it was shiny and silver like in color.
> Q: And you testified you thought it might be a gun?
> A: That would be my assumption, but I don't know what it is. So it could be a weapon of opportunity. . . . It could have been anything. It could have been ninja stars for all I know. Like – but I didn't know what it – what it was.

*Id.* at 8.

Thirty-three seconds elapsed between the time Officer Browder arrived in the alley and the time he fired his handgun. Less than five seconds elapsed between the time Officer Browder got out of his car and the time he fired his handgun. Plaintiffs' expert testified that Nehad was approximately "17 feet" from Officer Browder at the time of the shooting. (ECF No. 118-3 at 10). Defendants' expert testified that it would have taken Nehad "several seconds" to reach Officer Browder at the pace Nehad was walking. (ECF No. 138-3 at 333.) Expert witnesses employed by the parties provided conflicting evidence regarding reasonable alternatives to the use of deadly force under the facts of this case.

Officer Browder was wearing a body-worn camera and did not activate his body-worn camera. A stationary video camera on a building in the alley recorded Officer Browder arrive and turn his vehicle into the alley. The video shows the suspect appear and walk at steady pace toward Officer Browder's vehicle. The video shows Officer Browder exit his vehicle and the suspect continue to advance toward Officer Browder. The video shows Officer Browder shoot the suspect at a distance of between fifteen and twenty feet. The video shows the suspect begin to slow less than a second before he was shot by Officer Browder.

Officer Browder gave a voluntary interview five days after the shooting. Before the interview, Officer Browder and his attorney were given the video of the shooting. Officer Browder stated in the interview that he believed Nehad was holding a knife and aggressing him. Officer Browder returned to his duties after the shooting and was not disciplined for the shooting.

Nehad had convinced multiple people that he was armed with a knife on the night of the shooting and in the days before the shooting. On April 24, 2015, Nehad threatened to stab a caller while in the Midway District. On April 25, 2015, Nehad was detained by police after a hotel security guard reported Nehad had threatened him with a knife. The weapon was in fact a pen. Nehad was also contacted in the Midway

District after it was reported that a man was threatening people with a weapon.

Approximately five minutes before the shooting, the clerk at the adult book store who made the 911 call told the dispatcher that the man identified as Nehad threatened him with a knife. A few minutes before the call by the clerk at the adult bookstore, another witness saw what he later reported to police as a knife in Nehad's hand.

## CONTENTIONS OF THE PARTIES

Defendant Browder contends that he is entitled to summary judgment on the grounds that he did not violate the Fourth or Fourteenth Amendment rights of Nehad and Plaintiffs. Defendant Browder asserts that the undisputed facts in the record show that he reasonably believed he faced an immediate threat of serious bodily injury or death, and that his use of force was reasonable under the circumstances. Defendant Browder further asserts that the undisputed facts establish that he is entitled to qualified immunity. Defendants City of San Diego and Shelley Zimmerman contend that there is no *Monell*[1] liability and no supervisory liability because there was no constitutional violation of Plaintiffs' civil rights and no facts to support supervisor liability. All Defendants contend that the state claims for deprivation of civil rights, assault and battery, and negligence fail as a matter of law.

Plaintiffs contend that summary judgment must be denied because the objective factors do not justify the force used against Nehad by Officer Browder. Plaintiffs assert that no serious crime was occurring and that Nehad was unarmed. Plaintiffs assert that Nehad made no threatening motions toward Officer Browder or anyone else, and that Nehad held his pen out in the open where Officer Browder could see it. Plaintiffs assert that a ballpoint pen does not look like a knife, and that a reasonable officer of Officer Browder's experience and training should be able to distinguish a knife from a pen. Plaintiffs assert that Officer Browder was in a secure position with room to retreat and that a reasonable jury could find that Officer Browder used more force than necessary under the circumstances. Plaintiffs further contend that Officer Browder is not entitled

---

[1] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

to qualified immunity because he violated a "clearly established right" relying upon precedent in *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001).

**APPLICABLE STANDARD**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324 (1986).

To avoid summary judgment, the nonmovant must designate which specific facts show that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989). A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The materiality of a fact is thus determined by the substantive law governing the claim or defense. *See Anderson*, 477 U.S. at 248, 252; *Celotex*, 477 U.S. at 322; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

**ANALYSIS**

**I. Constitutional violation**

The Fourth Amendment permits law enforcement officers to use force "'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "Other relevant factors include the availability of less

intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011). "[T]he 'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available so long as they act within the range of reasonable conduct." *Hughes v. Kisela*, 862 F.3d 775, 780 (9th Cir. 2016).

At this stage, "all justifiable inferences are to be drawn in [the plaintiff's] favor." *Anderson*, 477 U.S. at 255. The Court of Appeals has recently "noted that '[b]ecause [the question of excessive force] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Hughes*, 862 F.3d at 782 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

Viewing the facts in the light most favorable to Plaintiffs, the Court concludes that the first factor noted in *Graham*, the severity of the crime at issue, weighs in favor of the reasonableness of Officer Browder's actions. Officer Browder responded to a hot call that a suspect was threatening people with a knife at midnight in the Midway District. Officer Browder received a hot call to investigate a serious crime and could reasonably anticipate that he would encounter a suspect with a knife. Officer Browder

had no indication that the dispatch call involved mental illness or emotional distress.[2] *See Hughes v. Kisela*, 862 F.3d 775, 780 (9th Cir. 2017) (finding that the first factor weighed in favor of plaintiffs in an excessive force case where the officer was responding to welfare check with no crime reported).

The second and "most important" factor in determining the reasonableness of the use of force is "whether the suspect posed an immediate threat to the safety of the officers or others." *George*, 736 F.3d at 838 (internal quotation omitted). In this case, the undisputed facts in the record show that Officer Browder was responding to a potentially dangerous situation involving a suspect reported to be threatening people with a knife. Officer Browder initially observed two civilians and then observed an individual fitting the description of the suspect approaching down an alley toward his vehicle, arm bent at the elbow with a pointy metallic object in his hand. Officer Browder confirmed the description of the suspect with dispatch, as the suspect continued to advance toward his vehicle. Officer Browder exited his vehicle with his weapon drawn believing that the suspect had a knife. All of the actions taken by Officer Browder were consistent with his stated belief that the suspect had a knife in his hand. Three civilian witnesses at the scene heard Officer Browder verbally warn the individual saying "Stop" and "Drop it." A witness testified that Officer Browder put his hand out in a gesture to tell the suspect to stop. A witness ten steps away from Officer Browder testified that the suspect was "fiddling with something in his midsection". . . "shiny and silver like in color." (ECF No. 118-2 at 5, 8). The Court concludes that the objective facts in this record support Officer Browder's belief that the suspect was

---

[2] Nehad did suffer from mental illness. The record contains information regarding numerous instances of threatening conduct by Nehad which had been reported to police beginning as early as in 2004, many of which involved knives. (ECF No. 118-4 at 11-14). However, the Court only considers evidence known to Officer Browder in assessing the objective reasonableness of the force used in this case. *See Kingsley v. Hendrickson*, 576 U.S. ___, 135 S.Ct. 2466, 2473 (2015); *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013).

advancing toward him with a knife and posed an immediate threat to his safety.³ The only evidence in this record that Officer Browder's belief was not reasonable is the discovery that the "pointy metallic object" was a pen and not a knife, a fact known to Officer Browder only after the decision to shoot had been made. (ECF No. 118 at 13).

The third factor cited in *Graham* is whether the suspect was resisting or seeking to evade arrest. The entire event in this case took place in thirty-three seconds. Officer Browder was required to make a split-second decision to use deadly force. There is evidence in the record that Officer Browder attempted warnings by stating "Stop. Drop It." However, the opportunity to warn and the opportunity to consider using less intrusive force were necessarily limited by the less than five seconds that elapsed from the time Officer Browder left his police car and the shooting. Opinions of experts hired by the parties differ as to whether less than deadly force was a reasonable alternative under the facts.

In this case, Officer Browder was responding to a hot call describing a suspect who had reportedly threatened the person making the 911 call with a knife. Officer Browder immediately observed two civilians on the scene and the suspect advancing down an alley with his arm bent and a pointy metallic object that appeared to be a knife in his hand. Witnesses at the scene testified that the suspect was "fiddling with something in his midsection" and that Officer Browder warned the suspect to "Stop. Drop it." (ECF No. 118-2 at 5). Believing that the suspect was advancing toward him with a knife, Officer Browder exited his vehicle with his handgun drawn. After warning the suspect, Officer Browder shot the suspect fifteen to twenty feet from his location. It is an undisputed fact in this record that "Nehad had convinced multiple people that he was armed with a knife the night of the shooting and in the days before the shooting." (ECF No. 146-1 at 12). The objective, undisputed facts in this record

---

³ In this case, the material facts are not in dispute. The evidence includes a video recording which captured the actions of Officer Browder and Nehad, and the testimony of civilian witnesses who had a view of the entire incident.

support Officer Browder's perception that Nehad posed an immediate threat to his safety under the facts and circumstances presented.

Expert witnesses employed by the parties provide conflicting testimony regarding reasonable alternatives to the use of deadly force. Plaintiffs' expert offers the opinion that Officer Browder had obvious reasonable alternatives that he was required to take rather than opt for the use of lethal force in this set of facts.[4] However, "the appropriate inquiry is whether [Officer Browder] acted reasonably, not whether [he] had less intrusive alternatives available to [him]." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). In *Scott,* the Court of Appeals explained:

> Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission. Instead, he would need to ascertain the least intrusive alternative (an inherently subjective determination) and choose that option and that option only. Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment.
>
> Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.

*Id.* In *Peterson on behalf of L.P. v. Lewis Cty.*, 697 F. App'x 490, 491 (9th Cir. 2017), sheriff deputies responded to a 911 call stating that a man identified as "Steven Peterson" was trying to break into their mobile home and that the man had tried to kick the door down and stabbed the front door with a knife. Officer McKnight responded to the call and spotted an individual closely matching the suspect's description that he believed was the suspect. Believing that the suspect was armed with a knife, Officer McKnight exited his patrol car and made contact with Peterson. Peterson's right hand was visible but his left hand was concealed in his sweatshirt pocket. Officer McKnight

---

[4] "They include (but are not limited to) simply not confronting [Nehad] one-on-one (Back-up units were due to arrive in seconds), tactically repositioning to cover to gain time and properly assess the true nature of any perceived threat, using less lethal weapons in his possession, etc." (ECF No. 138-3 at 443).

identified himself as police officer and told Peterson that he needed to see his hands. Peterson started to pace back and forth and kept his left hand hidden inside of his pocket. Officer McKnight drew his gun, Peterson continued to ignore his commands, leaned forward and took two steps toward Officer McKnight. Officer McKnight shot Peterson four times when Peterson was fifteen-twenty feet away. Peterson was unarmed. The entire interaction lasted one minute and eleven seconds. The district court concluded that a reasonable jury could find that Officer McKnight's use of force was not reasonable but that Officer McKnight was entitled to qualified immunity. *Peterson v. Lewis Cty.*, 2014 WL 58005 (W.D. Wash. 2014). The Court of Appeals found that the district court erred in granting qualified immunity. *Peterson v. Lewis Cty.*, 663 F. App'x 531 (2016). The United States Supreme Court vacated the judgment and remanded to the Court of Appeals for further consideration in light of *White v. Pauly*, 580 U.S. – , 137 S. Ct. 548 (2017) (*per curiam*). *McKnight v. Peterson*, 137 S. Ct. 2241 (2017). On remand, the Court of Appeals concluded that the district court erred by finding that there were material factual disputes regarding whether Officer McKnight's use of deadly force was reasonable. The Court of Appeals stated:

> The record reflects that Peterson refused to heed McKnight's commands and started to charge McKnight. At the time he used force, McKnight knew that a person matching Peterson's description was in the area and might be armed with a knife. Given these facts, McKnight's actions were reasonable; he did not act with excessive force in violation of Peterson's constitutional rights.

*Peterson*, 697 F. App'x at 491.[5] While this unpublished case is not precedent, the factual similarities with the case before this Court are significant and define a range of conduct found to be reasonable by the Court of Appeals.

At the time that Officer Browder used force, he had confirmed that the description of the suspect matched the person approaching him holding a shiny metallic object in his hand with his arm bent at the elbow. At the time that Officer Browder used

---

[5] The Court of Appeals further stated: "Even if McKnight had acted unreasonably, Peterson failed to identify any clearly established law putting McKnight on notice that, under the facts, his conduct was unlawful." *Id.*

force, Officer Browder had reason to believe that the suspect approaching him had used a knife to threaten people just a few minutes earlier. Officer Browder warned the suspect approaching him to "Stop. Drop it." Officer Browder used his weapon against the suspect fifteen to twenty feet away that he had reason to believe was armed with a knife. The entire incident took thirty-three seconds. Given these facts, the relevant factors in *Graham* weigh in favor of finding that the force used was objectively reasonable. Drawing another conclusion based upon potential alternatives to the use of deadly force would be "second-guessing of police decisions made under stress and subject to the exigencies of the moment." *Scott*, 39 F.3d at 915. The Court concludes that Officer Browder is entitled to summary judgment in his favor on the grounds that there was no violation of Nehad's Fourth Amendment right.

As to the Fourteenth Amendment claim, Plaintiffs allege that the Officer Browder violated Plaintiffs' liberty interest in the companionship of their eldest child and only son, a right secured by the Fourteenth Amendment. "The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child. . . ." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). In *A. D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013), the Court of Appeals explained:

> Police conduct violates due process if it "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Conscience-shocking actions are those taken with (1) "deliberate indifference" or (2) a "purpose to harm . . . unrelated to legitimate law enforcement objectives." *Id*. The lower "deliberate indifference" standard applies to circumstances where "actual deliberation is practical." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). However, in circumstances where an officer cannot practically deliberate, such as where "a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id*.

In this case, Officer Browder had no time to deliberate and the heightened "purpose to harm" standard applies. *Id*. There are no facts in this record to support liability on the grounds that Officer Browder acted with a purpose to harm unrelated to legitimate law enforcement objectives. Officer Browder is entitled to summary

judgment on Plaintiffs' claim under 42 U.S.C. § 1983 that he violated Plaintiffs' liberty interest secured by the Fourteenth Amendment.

**II. Qualified Immunity**

Assuming a constitutional violation, "[q]ualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White*, 137 S.Ct. at 551, (quoting *Mullenix v. Luna*, 577 U.S. – , 136 S. Ct. 305, 308 (2015) (*per curiam*)). "The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Hughes*, 862 F.3d at 782 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)). The United States Supreme Court recently stated that "qualified immunity is important to society as a whole and . . . effectively lost if a case is erroneously permitted to go to trial." *White*, 137 S. Ct. at 552 (internal quotations and citations omitted). At summary judgment,

> an officer will be denied qualified immunity in a Section 1983 action only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation.

*Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

Under the second prong of the qualified immunity test, the Court must decide if the alleged violation of Nehad's constitutional right against excessive force under the Fourth Amendment "was clearly established at the time of the officer's alleged misconduct." *S.B. v. Cty of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017) (quoting *C.V. by and through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (citations omitted)). Officer Browder is entitled to qualified immunity unless it was "'sufficiently clear' that 'every reasonable official would have understood that what he was doing violates [Plaintiff's] right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

After identifying the context-specific conduct, "[t]he relevant inquiry is whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances 'beyond debate.'" *Mullenix*, 136 S. Ct. 305, 309 (quoting *al-Kidd*, 563 U.S. at 741). The Supreme Court has repeatedly stated that "clearly established law" should not be defined "at a high level of generality." *al–Kidd*, 563 U.S. at 742. "[T]he clearly established law must be 'particularized' to the facts of the case." *White*, 580 U.S. – , 137 S.Ct. at 552 (quoting *Anderson*, 483 U.S. at 640). In *White*, the Supreme Court concluded that the Court of Appeals failed to identify a case in which an officer acting under similar circumstances was held to have violated the Fourth Amendment. The Supreme Court explained:

> Instead, the majority relied on *Graham*, *Garner*, and their Court of Appeals progeny, which—as noted above—lay out excessive-force principles at only a general level. Of course, "general statements of the law are not inherently incapable of giving fair and clear warning" to officers, *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), but "in the light of pre-existing law the unlawfulness must be apparent," *Anderson v. Creighton*, supra, at 640, 107 S.Ct. 3034. For that reason, we have held that *Garner* and *Graham* do not by themselves create clearly established law outside "an obvious case." *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam ); *see also Plumhoff v. Rickard*, 572 U.S. ——, ——, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (emphasizing that *Garner* and *Graham* "are 'cast at a high level of generality'").

*Id.*

In the specific context of this case, Officer Browder responded to a hot call of a suspect threatening people with a knife after midnight. Officer Browder identified the suspect in an alley with other civilians nearby. The suspect was holding a metallic object at waist level advancing toward the officer. Believing that the suspect was advancing with a knife, Officer Browder warned the suspect to "Stop. Drop it." Officer Browder used deadly force when the suspect was fifteen-twenty feet away. The entire incident was over in approximately thirty-three seconds.

Before this Court can impose liability on Officer Browder, the Court must identify precedent as of April 30, 2015, that put Officer Browder "on clear notice that using deadly force in these particular circumstances would be excessive." *S.B.*, 864

F.3d at 1015. "While the case law does not require a case directly on point, for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White,* 137 S. Ct. at 551. (internal quotations and citations omitted). "[T]he clearly established inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition, especially in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *S.B.*, 864 F.3d at 1015 (internal citations omitted); *see Estate of Lopez by and through Lopez v. Gelhaus,* 871 F.3d 998 (9th Cir. 2017) ("The district court erred by failing 'to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'") (citing *White,* 137 S.Ct. at 552).

Plaintiff asserts that *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) provided clear notice to Officer Browder that the use of deadly force was objectively unreasonable under the circumstances of this case. In *Deorle*, the officer responded to a call from a woman seeking help for her distressed husband, Deorle. Deorle was upset, drunk, and suicidal. At different points, Deorle brandished a hatchet, shouted "kill me," threatened to "kick [a police officer's] ass," and walked around with an unloaded crossbow. *Id.* at 1276-77. At least thirteen officers responded to the request for back up. Officer Rutherford observed Deorle for five to ten minutes from the cover of some trees. Deorle started shouting at the officers while carrying an unloaded plastic crossbow in one hand and what may have been a bottle of lighter fluid in the other hand. Officer Rutherford shouted at Deorle to put down the crossbow and Deorle discarded it. Deorle began walking in the direction of Officer Rutherford. Officer Rutherford waited until Deorle reached a predetermined point then fired a twelve-gauge shotgun loaded with a bean bag round. Deorle was hit in the face and suffered permanent injuries.

In contrast to *Deorle*, Officer Browder was called to the scene at midnight to

- 15 - 15cv1386 WQH - NLS

locate a suspect reported to have threatened an individual with a knife. This dispatch call was not a welfare check or a report from a distressed family member. Officer Browder was immediately confronted with an individual that fit the description of the suspect advancing in his direction holding in his hand what Officer Browder believed was a knife. Unlike the officer in *Deorle,* who observed Deorle for a significant amount of time, Officer Browder was forced to react to the facts presented within thirty seconds and was forced to decide what level of force was necessary within five seconds from exiting his patrol car. The facts of *Deorle* differ significantly from the facts presented to Officer Browder and are not sufficiently analogous to place Officer Browder on fair notice that it was objectively unreasonable to use deadly force under the facts of this case.

Plaintiffs have not identified any preexisting precedent establishing that Officer Browder's use of deadly force violated any clearly established right of Nehad to be free from excessive force. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Officer Browder was forced to make "split-second judgments—in circumstances that [were] tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Unlike *Estate of Lopez by and through Lopez,* postdating this case, and *George v. Morris*, 736 F.3d 829 (9th Cir. 2013) relied upon as clearly established precedent in *Lopez*, Officer Browder was confronted with objectively threatening behavior from a suspect reported to have threatened an individual with a knife.

Plaintiffs further assert that the exception to the requirement of pre-existing precedent in an "obvious case" applied to put Officer Browder on notice of the unlawfulness of his conduct. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). In *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938 (2017), the Court of Appeals

recently affirmed that the general standard in *Garner*[6] and *Graham* can clearly establish law governing the use of deadly force "even without a body of relevant case law." *Id.* at 951. The Court of Appeals stated: "We recently held in *Hughes* that an officer was not entitled to qualified immunity for his shooting of an individual in part because, when the facts were construed in plaintiff's favor, the officer's use of deadly force was . . . 'obvious[ly]' unlawful." *Id.* (quoting *Hughes*, 862 F.3d at 785). "[T]aking the facts in the light most favorable to the plaintiff and comparing them to the facts in available precedent involving excessive force," the Court of Appeals held that "no officer could have reasonably believed that the plaintiff posed a risk of serious injury or death." *Id.* at 951-52.

In this case, construing the facts in the light most favorable to Plaintiffs, the Court concludes that Officer Browder had a reasonable belief based upon the objective facts that Nehad posed a risk of serious injury to himself or others. Officer Browder had information that Nehad had threatened others with a knife, encountered Nehad advancing toward him in a threatening manner, and warned Nehad to "Stop. Drop It." While experts may offer the opinion that Officer Browder should have waited another second or allowed Nehad to advance another few feet before using deadly force, Officer Browder could have reasonably believed that Nehad posed a risk of serious injury or death. The Court concludes that Officer Browder's use of force was not obviously unlawful.

Because no case holds that conduct closely analogous to the conduct at issue in this case violated a plaintiff's constitutional rights and Officer Browder's use of force was not obviously unlawful, the Court concludes that Officer Browder is entitled to qualified immunity. Officer Browder is entitled to judgment in his favor on the federal claim under 42 U.S.C. § 1983 that excessive force was used in violation of the Fourth Amendment.

Having dismissed any claim for liability under 42 U.S.C. § 1983 for a

---

[6] *Tennessee v. Garner*, 471 U.S. 1 (1985).

constitutional violation, and based upon the undisputed facts in this case, the Court concludes that there is no triable issue of fact as to whether any custom and practice of the San Diego Police Department caused the shooting in this case. Plaintiffs have failed to present evidence that any policy or deficient training was a "moving force" behind the shooting in this case. *Monell*, 436 U.S. at 694. The Court concludes that Defendants Zimmerman and the City are entitled to summary judgment on the *Monell* claim and that Defendant Zimmerman is entitled to summary judgment on the claim for supervisory liability.

**III. State law claims**

Because the Court concluded that Officer Browder's use of force was reasonable under the objective, undisputed facts, Defendants are entitled to summary judgment on all state law claims. *Yount v. City of Sacramento*, 183 P.3d 471, 484 (Cal. 2008) ("[C]ommon law battery cause of action, like his Section 1983 claim, requires proof that [the officer] used unreasonable force.").

**VI. Conclusion**

IT IS HEREBY ORDERED that motion for summary judgment (ECF No. 116) filed by Defendants Neal N. Browder, Shelley Zimmerman, and the City of San Diego is granted.

IT IS FURTHER ORDERED that motions #114, #115 and #121 are denied without prejudice as moot.

The Clerk of the Court shall enter judgment in favor of Defendants and against Plaintiffs.

DATED: December 18, 2017

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge